FILED
U.S. DISTRICT COURT

2010 OCT 19  P 1: 42

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

FILED
THIRD DISTRICT COURT

10 OCT 12  PM 4: 38

SALT LAKE DEPARTMENT
BY_____ *mp*
DEPUTY CLERK

Kevin N. Anderson, 0100
Scott M. Petersen, 7599
FABIAN & CLENDENIN,
A Professional Corporation
215 South State Street, 12th Floor
P.O. Box 510210
Salt Lake City, Utah 84151
Telephone: (801) 531-8900
kanderson@fabianlaw.com
spetersen@fabianlaw.com

*Attorneys for Defendant Sparxent, Inc.*

## IN THE THIRD JUDICIAL DISTRICT COURT
## SALT LAKE COUNTY, UTAH

| | |
|---|---|
| DAVID R. TAYLOR, | **NOTICE OF REQUEST FOR REMOVAL TO UNITED STATES DISTRICT COURT** |
| Plaintiff, | |
| vs. | *100917452*<br>Civil No. ~~0100917542~~ |
| SPARXENT, INC., a Delaware corporation, | **Judge Hilder** |
| Defendant. | *210CV1007  C W* |

Defendant Sparxent, Inc., ("Defendant") hereby advises the Clerk of the Third Judicial

District Court, Salt Lake County, State of Utah, that Defendant has given Notice of Removal of

the above-referenced action to the United States District Court, District of Utah, Central

Division.  A copy of Defendant's Notice of Removal is attached hereto and incorporated herein

by reference.

DATED this $\cancel{12}$ day of October 2010.

Scott M. Petersen
Kevin N. Anderson
FABIAN & CLENDENIN,
a Professional Corporation

*Attorneys for Defendant Sparxent, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this ___ day of October, 2010, the foregoing **NOTICE OF**

**REQUEST FOR REMOVAL TO THE UNITED STATES DISTRICT COURT** was served

via United States mail, postage prepaid, to the following:

Matthew M. Durham
Cameron L. Ward
Stoel Rives LLP
201 S. Main Street, Suite 1100
Salt Lake City, Utah 84111

4833-1159-6807, v. 1

ND: 4836-0754-8930, v. 1                             2

Kevin N. Anderson, 0100
Scott M. Petersen, 7599
FABIAN & CLENDENIN,
 A Professional Corporation
215 South State Street, Suite 1200
Salt Lake City, Utah  841111-2323
Telephone: (801) 531-8900
kanderson@fabianlaw.com
spetersen@fabianlaw.com

FILED
U.S. DISTRICT COURT

2010 OCT 12  P 3: 05

DISTRICT OF UTAH

BY:_____
      DEPUTY CLERK

*Attorneys for Defendant Sparxent, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID R. TAYLOR,<br><br>               Plaintiff,<br><br>vs.<br><br>SPARXENT, INC., a Delaware<br>corporation,<br><br>               Defendant. | **NOTICE OF REQUEST FOR REMOVAL TO UNITED STATES DISTRICT COURT**<br><br>`Case: 2:10cv01007`<br>`Assigned To : Waddoups, Clark`<br>`Assign. Date : 10/12/2010`<br>`Description: Taylor v. Sparxent` |

Pursuant to 28 U.S.C. §§ 1332(a)(1), 1441 and 1446(b), Defendant Sparxent, Inc.,

("Sparxent") gives notice of removal to the United States District Court for the District of Utah

of the following case pending in the Third District Court of the State of Utah:

> *David R. Taylor, Plaintiff v. Sparxent, Inc. a Delaware corporation,* Case
> No. 0100917542, pending in the Third District Court, State of Utah, Salt
> Lake County, before Judge Hilder.

Pursuant to 28 U.S.C. § 1446(a), copies of all process and pleadings sent to or served

upon Sparxent are attached hereto as Exhibit A.

## TIMELINESS OF REMOVAL

1.      Plaintiff David R. Taylor ("Taylor") served his Complaint on Defendant on September 21, 2010. This Notice of Removal is being filed within thirty (30) days of said service. Accordingly, this Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b).

## GROUNDS FOR REMOVAL: DIVERSITY OF CITIZENSHIP

2.      Jurisdiction in this Court is founded on 28 U.S.C. § 1441 on the basis of diversity of citizenship. The Court has original diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interests and costs.

3.      Plaintiff David R. Taylor alleges to be a natural person residing in Alpine, Utah. (*See* Compl., ¶ 1). Thus, he is a citizen of Utah.

4.      Sparxent was and is a Delaware Corporation with its principal place of business in California. *See* Declaration of Andrew Hyde, Exhibit B.

5.      For the purpose of determining diversity, a corporation is deemed to be a citizen of both the state of its incorporation and of the state where it has its principal place of business. *See* 28 U.S.C. § 1332(c)(1).

6.      Thus, pursuant to 28 U.S.C. § 1332(c)(1), Sparxent is not a citizen of Utah, but rather of Delaware and California. Accordingly, there is a complete diversity of citizenship.

7.      Taylor's complaint seeks, among other things, recovery for breach of contract in an amount exceeding $425,046.73. (*See* Compl., ¶ 32). Thus, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

8.      Pursuant to 28 U.S.C. §1441, removal to this District Court is proper because this

district and division embrace the State Court in which the removed action was pending.

WHEREFORE, the United States District Court has original jurisdiction pursuant to 28

U.S.C. §1332, and Plaintiff's case should therefore be removed to the Federal District Court for

the District of Utah.

DATED this /2th day of October, 2010.

Kevin N. Anderson
Scott M. Petersen
FABIAN & CLENDENIN,
A Professional Corporation

*Attorneys for Defendant Sparxent, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing **NOTICE OF**

**REQUEST FOR REMOVAL TO UNITED STATES DISTRICT COURT** to be mailed,

postage prepaid, this __12__ day of October 2010, to the following:

> Matthew M. Durham
> Cameron L. Ward
> Stoel Rives LLP
> 201 S. Main Street, Suite 1100
> Salt Lake City, Utah 84111

I also certify that I caused to be filed with the Clerk of the Third Judicial District Court in

and for Salt Lake County, State of Utah, a copy of the **NOTICE OF REMOVAL** this __12__

day of October, 2010.

<div style="text-align:center">

Kevin N. Anderson
*Counsel for Defendant Sparxent, Inc.*

</div>

4814-9683-9431, v. 1

4

A

FILED
~15~ ~~~ ~ ~~~ T

10 SEP 16  AM 11: 16

TO FILE THE DISTRICT
SALT LAKE COUNTY

BY _____ _____
           DEPUTY CLERK

Matthew M. Durham (6214)
Cameron L. Ward (12271)
STOEL RIVES LLP
201 S Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone: (801) 328-3131

Attorneys for Plaintiff

IN THE THIRD JUDICIAL DISTRICT COURT IN AND FOR

SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| DAVID R. TAYLOR, an individual,<br><br>    Plaintiff,<br><br>  v.<br><br>SPARXENT, INC., a Delaware<br>corporation,<br><br>    Defendant. | **COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)**<br><br><br>Civil No. 100917452<br><br>The Honorable Hilder |

Plaintiff David R. Taylor ("Mr. Taylor") alleges and complains against Defendant

Sparxent, Inc. ("Sparxent") as follows:

## PARTIES

1.    Mr. Taylor is an individual residing in Alpine, Utah.

2.    On information and belief, Sparxent is a corporation organized and existing under

the laws of the State of Delaware with its principal place of business located at 2795 East-

Cottonwood Parkway, Suite 360, Salt Lake City, Utah 84121.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to Utah Code Ann. §§ 78A-5-102 (2008).

4.      Venue is proper in this Court pursuant to Utah Code Ann. §§ 78B-3-304 and 78B-3-307 (2008).

## GENERAL ALLEGATIONS

5.      On or about August 31, 2007, Mr. Taylor entered into an Employment Agreement with Sparxent.[1]  A true and correct copy of the Employment Agreement is attached hereto as Exhibit A and incorporated herein.

6.      Pursuant to the Employment Agreement, Mr. Taylor is entitled to certain severance benefits if his employment is terminated without "Cause," or if he terminates his employment for "Good Reason." *See* Employment Agreement, §§ 1, 9.

7.      Specifically, pursuant to Section 9 of the Employment Agreement: "If [Sparxent] terminates [Mr. Taylor's] employment other than for Cause or if [Mr. Taylor] terminates his employment for Good Reason then, subject to [Mr. Taylor] executing and not revoking a standard form of release of claims with [Sparxent] and complying with Section 10 of this

---

[1] At the time Mr. Taylor executed the Employment Agreement, Sparxent was operating under the name of VARCity, Inc. as indicated in the Employment Agreement. On or about June 27, 2008, however, VARCity, Inc. amended and restated its certificate of incorporation and bylaws to, among other things, change the name of the company from VARCity, Inc. to Sparxent, Inc. *See* VARCity, Inc.'s Board Minutes, dated June 27, 2008, attached hereto as Exhibit D. Thus, any reference to VARCity, Inc. or the "Company" in the Employment Agreement is a reference to Sparxent, Inc.

Agreement, [Mr. Taylor] shall be entitled to the following severance benefits: (i) Twelve (12) months of [Mr. Taylor's] Base Salary as in effect as of the date of such termination, less applicable withholding, payable in a lump sum within thirty (30) days of the Termination Date; (ii) One (1) times [Mr. Taylor's] prorated annual bonus as of the date of termination payable in a lump sum within thirty (30) days of the Termination Date; (iii) the same level of health . . . coverage and benefit as in effect for [Mr. Taylor], and, if applicable, [Mr. Taylor's] dependents, . . . ." *Id.* § 9(b)(i)-(iii).

      8.     Section 9 of the Employment Agreement further provides that "Without regard to the reason for, or the timing of, [Mr. Taylor's] termination of employment: (i) [Sparxent] shall pay [Mr. Taylor] any unpaid Base Salary due for periods prior to the Termination Date, (ii) [Sparxent] shall pay [Mr. Taylor] all of [his] accrued and unused vacation through the Termination Date, and (iii) following submission of proper expense reports by [Mr. Taylor], [Sparxent] shall reimburse [Mr. Taylor] for all expenses reasonably and necessarily incurred by [Mr. Taylor] in connection with the business of [Sparxent] prior to the Termination Date. These payments shall be made promptly upon termination and within the period of time mandated by law." *Id.* § 9(d).

      9.     Under the Employment Agreement "'Cause' is defined as (i) an act of dishonesty by [Mr. Taylor] in connection with [Mr. Taylor's] responsibilities as an employee, (ii) [Mr. Taylor's] conviction of, or plea of *nolo contendere* to, a felony, (iii) [Mr. Taylor's] gross misconduct, (iv), [Mr. Taylor's] continued substantial nonperformance of [his] employment duties hereunder fifteen (15) days after [Mr. Taylor] has received a written demand for

performance from [Sparxent] which describes the basis for [Sparxent's] belief that [Mr. Taylor] has not substantially performed [his] duties, or (v) [Mr. Taylor's] breaching, in any material respect, the terms of this Agreement or any confidentiality or proprietary information agreement with [Sparxent]." *Id.* § 1(a).

10.    Pursuant to the Employment Agreement "'Good Reason' shall mean the voluntary termination of employment by [Mr. Taylor] within two (2) weeks of the occurrence of any of the following events, without [Mr. Taylor's] express written consent: (i) any material diminution in [Mr. Taylor's] duties or responsibilities with [Sparxent] in effect immediately prior to such reduction, (ii) any reduction by [Sparxent] in the Base Salary as set forth in Section 5(a) hereof, (iii) the breach of a material term of this Agreement by [Sparxent], (iv) the relocation of [Mr. Taylor's] primary place of employment to a location more than 30 miles from its current location, or (v) the failure of [Sparxent] to obtain the assumption of this Agreement by any successor contemplated in Section 11 below."

11.    Pursuant to the terms of the Employment Agreement, Mr. Taylor's annual "Base Salary" was set at $200,000.00 *Id.* § 5(a).

12.    Under the Employment Agreement. Mr. Taylor was also eligible for an annual performance bonus of $200,000.00. *See id.* § 5(b).

13.    On or about October 19, 2009, Steven DeWindt ("DeWindt"), former CEO of Sparxent, informed Mr. Taylor that his employment at Sparxent was being terminated. DeWindt informed Mr. Taylor that this decision was made by Ed Ekstrom, a board member and significant investor in Sparxent. DeWindt, however, did not provide any reason for this decision.

14.    Although DeWindt informed Mr. Taylor that his employment was being terminated, no effective date for this decision was officially communicated to Mr. Taylor. Rather, Mr. Taylor was told that his Sparxent email account would be discontinued on October 23, 2009, and that he should destroy his corporate American Express card. In addition, Mr. Taylor was informed that Ashley Leonard would become the President/COO of Sparxent and that he, not Mr. Taylor, would be the primary contact with companies in Sparxent's acquisition queue.

15.    Sparxent was less than forthcoming with information regarding Mr. Taylor's termination. Additionally, the Employment Agreement provides a very limited two-week window for Mr. Taylor to exercise his right to voluntarily resign for good cause. Thus, on or about October 29, 2009, Mr. Taylor sent Sparxent a letter stating that it was his understanding that he had been terminated without cause. *See* Letter from M. Durham to A. Hyde, dated Oct. 29, 2009, attached hereto as Exhibit B. Mr. Taylor further stated that to the extent Sparxent had not officially terminated his employment he voluntarily resigned for good reason because there had been a material diminution in his duties and responsibilities at Sparxent. *See id.*

16.    In response, Ed Ekstrom called Mr. Taylor and acknowledged receipt of the October 29, 2009 letter. At no time, however, did Ed Ekstrom or Sparxent communicate any disagreement with Mr. Taylor's understanding as set forth in that letter.

17.    Mr. Taylor did not commit any acts of dishonesty in connection with his responsibilities as a Sparxent employee.

18.    Mr. Taylor has not been convicted of or pled guilty to a felony.

19. Mr. Taylor did not commit any gross misconduct in connection with his employment at Sparxent..

20. Mr. Taylor never received any written demand for performance from Sparxent indicating that he was not substantially performing his duties. Indeed, Mr. Taylor was never told that his job performance at Sparxent was deficient or that he did not meet the company's expectations.

21. Finally, Mr. Taylor has not violated the covenant not to compete set forth in Section 10 of the Employment Agreement.

22. Mr. Taylor's employment was terminated without "Cause" and/or Mr. Taylor voluntarily resigned for "Good Reason" and Mr. Taylor is therefore entitled to the severance benefits set forth in the Employment Agreement including: $200,000.00 for twelve months of his base salary; $166,666.00 for his 2009 pro-rated annual performance bonus; $7,692.00 of unused 2009 vacation time; $49,488.00 for unpaid and undisputed accrued bonus from 2008; and $1200.73 of unpaid back salary from 2009, for a total of $425,046.73.

23. On or about March 10, 2010, Mr. Taylor sent Sparxent a letter demanding a lump-sum payment of Mr. Taylor's benefits pursuant to the terms of the Employment Agreement. *See* Letter from M. Durham to A. Hyde, dated March 10, 2010, attached hereto as Exhibit C. Sparxent, however, has failed to pay Mr. Taylor his severance benefits.

24. As a direct and proximate result of Sparxent's failure to respond to Mr. Taylor's request and/or pay his severance benefits, Mr. Taylor has suffered and will continue to suffer damages in an amount to be proven at trial, but in any event no less than $425,046.73.

6

## FIRST CAUSE OF ACTION
### Breach of Contract

25. Mr. Taylor reincorporates and re-alleges paragraphs 1 through 24 of the Complaint as though fully set forth herein.

26. On or about August 31, 2007, Mr. Taylor and Sparxent entered into and executed the Employment Agreement.

27. Pursuant to the Employment Agreement, Mr. Taylor is entitled to certain severance benefits if he is terminated without "Cause" or if he resigns for "Good Reason."

28. On or about October 19, 2009, Mr. Taylor was terminated without "Cause."

29. Alternatively, on or about October 29, 2009, Mr. Taylor resigned for "Good Reason" because there had been a material diminution in his duties and responsibilities at Sparxent.

30. Mr. Taylor has fully performed his obligations under the Employment Agreement.

31. Sparxent, however, has breached the Employment Agreement by, among other things, failing to provide Mr. Taylor with his severance benefits as set forth in the Employment Agreement.

32. As a direct and proximate result of the foregoing, Mr. Taylor has suffered and will continue to suffer damages in an amount to be proven at trial, but in any event no less than $425,046.73.

## SECOND CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing

33.     Mr. Taylor reincorporates and re-alleges paragraphs 1 through 32 of the Complaint as though fully set forth herein.

34.     As set forth above, Mr. Taylor and Sparxent entered into and executed the Employment Agreement. Under Utah law, the Employment Agreement between Mr. Taylor and Sparxent contains an implied covenant that the terms shall be performed in good faith and in a spirit of fair dealing.

35.     Sparxent has breached this covenant by the actions described above by depriving Mr. Taylor of the severance benefits to which he is entitled under the Employment Agreement.

36.     As a direct and proximate result of Sparxent's breach of the implied covenant of good faith and fair dealing, Mr. Taylor has suffered general and consequential damages in an amount to be proven at trial, but in any event no less than $425,046.73.

## PRAYER FOR RELIEF

**WHEREFORE,** Mr. Taylor prays for judgment and relief against Sparxent as follows:

On all Causes of Action

1.     For general compensatory and consequential damages in an amount to be determined at trial, but in any event no less than $425,046.73, together with interest thereon;

2.     For all costs and expenses, including attorneys' fees, incurred by Mr. Taylor in pursuing his remedies against Sparxent;

3.     For pre- and post-judgment interest as established by Utah law; and

8

4.    For such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Mr. Taylor hereby demands a trial by jury on all issues in this action triable of right by a jury.

DATED: September 16, 2010.

STOEL RIVES LLP

Matthew M. Durham
Cameron L. Ward

Attorneys for Plaintiff

Plaintiff's Address:

David R. Taylor
531 S. Arnold Court
Alpine, UT 84004

# Exhibit A

## VARCITY, INC.

## EMPLOYMENT AGREEMENT

*THIS EMPLOYMENT AGREEMENT* (this *"Agreement"*) is entered into as of August 31, 2007 between VARCity, Inc., a Delaware corporation (the *"Company"*), and David R. Taylor ("*Executive*").

### RECITALS

A.   Executive is the President, Chief Executive Officer and Chief Financial Officer of the Company. The Board of Directors of the Company (the *"Board"*) believes that this Agreement will preserve and protect the assets of the Company, including the Company's goodwill and customers towards whom the Executive has, or will have, in his role as an employee of the Company, significant responsibilities. In consideration of the benefits provided to Executive under this Agreement, the Executive has agreed to enter into this Agreement.

B.   The Company and the Executive wish to enter into an employment relationship on the terms and conditions contained in this Agreement. This Agreement shall supersede any and all previous agreements between the Company and the Executive except as provided for in this Agreement.

### AGREEMENT

In consideration of the mutual covenants herein contained and the continued employment of Executive by Company, the parties agree as follows:

1.   Definition of Terms. The following terms referred to in this Agreement shall have the following meanings:

(a)   Cause.   "Cause" is defined as (i) an act of dishonesty by Executive in connection with Executive's responsibilities as an employee, (ii) Executive's conviction of, or plea of *nolo contendere* to, a felony, (iii) Executive's gross misconduct, (iv) Executive's continued substantial nonperformance of Executive's employment duties hereunder fifteen (15) days after Executive has received a written demand for performance from the Company which describes the basis for the Company's belief that Executive has not substantially performed Executive's duties, or (v) Executive's breaching, in any material respect, the terms of this Agreement or any confidentiality or proprietary information agreement with the Company.

(b)   Change of Control. "Change of Control" shall mean (i) the sale, lease, conveyance or other disposition of all or substantially all of the Company's assets as an entirety or substantially as an entirety to any "person" (as such term is used in Section 13(d) of the Securities Exchange Act of 1934, as amended), entity or group of persons acting in concert; (ii) any "person" becoming the "beneficial owner" (as defined in Rule 13d-3 under said Act), directly or indirectly, of securities of the Company representing 50% or more of the total voting power represented by the

Company's then-outstanding voting securities; (iii) a merger or consolidation of the Company with any other corporation, other than a merger or consolidation that would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its controlling entity) at least 50% of the total voting power represented by the voting securities of the Company or such surviving entity (or its controlling entity) outstanding immediately after such merger or consolidation; or (iv) a change in the composition of the Board occurring within a two (2)-year period, such that a majority of the then-current Board members ceases to be comprised of individuals who either (A) have been Board members continuously since the beginning of such period, or (B) have been elected or nominated for election as Board members during such period by at least a majority of the Board members described in clause (A) who were still in office at the time such election or nomination was approved by the Board.

(c) Disability. "Disability" shall mean Executive's inability to substantially perform Executive's essential job functions as the result of a physical or mental disability as determined by a qualified physician or incapacity for a period of 180 days, consecutive or otherwise, in any 360-day period.

(d) Good Reason. "Good Reason" shall mean the voluntary termination of employment by Executive within two (2) weeks of the occurrence of any of the following events, without Executive's express written consent: (i) any material diminution in Executive's duties or responsibilities with the Company in effect immediately prior to such reduction, (ii) any reduction by the Company in the Base Salary as set forth in Section 5(a) hereof, (iii) the breach of a material term of this Agreement by the Company, (iv) the relocation of Executive's primary place of employment to a location more than 30 miles from its current location, or (v) the failure of the Company to obtain the assumption of this Agreement by any successors contemplated in Section 11 below.

(e) Termination Date. "Termination Date" shall mean the effective date of any notice of termination delivered by one party to the other hereunder.

2. Duties and Scope of Employment.

(a) Positions and Duties. Executive will continue to serve as the Company's President, Chief Executive Officer and Chief Financial Officer. Executive will render such business and professional services in the performance of his duties, consistent with Executive's position within the Company as shall reasonably be assigned to him by the Board.

(b) Obligations. Executive will perform his duties faithfully and to the best of his ability and will devote his full business efforts and time to the Company. For the duration of this Agreement, Executive agrees not to actively engage in any other employment, occupation or consulting activity for any direct or indirect remuneration without the prior written approval of the Board. Notwithstanding the foregoing, nothing in this Agreement will prevent Executive from accepting speaking or presentation engagements in exchange for honoraria or from serving on boards of charitable organizations, or from owning no more than one percent (1%) of the outstanding equity securities of a corporation whose stock is listed on a national stock exchange.

9431:73

-2-

3. At-Will Employment. Company and Executive acknowledge that Executive's employment is and shall continue to be at-will, as defined under applicable law. If Executive's employment terminates for any reason, Executive shall not be entitled to any payments, benefits, damages, awards or compensation other than (a) as provided by this Agreement or (b) as may otherwise be established under the Company's then existing employee benefit plans or policies at the time of termination.

4. Confidential Information, Invention Assignment, Non-competition and Arbitration Agreement. Executive has completed and signed an Confidential Information, Invention Assignment, Non-competition and Arbitration Agreement (the "IP Agreement") which shall continue to be in full force and effect. The signed IP Agreement is attached hereto as Exhibit A.

5. Compensation.

(a)     Base Salary. The Company will accrue for Executive as compensation for his services a Base Salary at an annualized rate of $200,000 (the "Base Salary"). The Company will review Executive's Base Salary as appropriate and in no case less often than annually.

(b)     Bonus. For Company's 2007 and 2008 fiscal year, Executive will be eligible for an annual performance bonus of $200,000, 60% of which shall be payable in equal quarterly installments based upon achievement of specific quarterly performance metrics determined by the Board, and 40% of which shall be payable annually based upon the achievement of specific annual performance metrics determined by the Board, provided, in each case, that Executive is employed by the Company on those dates, and provided further, that the annual performance bonus for fiscal year 2007 will be prorated to reflect to duration of Executive's employment during such fiscal year. For subsequent Company fiscal years, Executive's target bonus amount and other terms and conditions of Executive's bonus will be established by the Board.

6. Employee Benefits. Executive will be entitled to participate in the employee benefit plans currently and hereafter maintained by the Company of general applicability to other employees and executives of the Company. The Company reserves the right to cancel or change the benefit plans and programs the Company offers to its employees at any time.

7. Vacation. Executive will be entitled to three (3) weeks paid vacation per year in accordance with Company's vacation policy, with the timing and duration of specific vacations mutually and reasonably agreed to by the parties hereto.

8. Expenses. Company will reimburse Executive for reasonable travel, entertainment or other expenses incurred by Executive in the furtherance of or in connection with the performance of Executive's duties hereunder, in accordance with the Company expense reimbursement policy as in effect from time to time.

9. Severance Benefits.

(a)     Termination Following a Change of Control. If Executive's employment with the Company terminates other than for Cause, death, or Disability at any time within three (3)
943073_1

-3-

months before or six (6) months after a Change of Control, then, subject to Executive executing and not revoking a standard form of release of claims with the Company and complying with Section 10 of this Agreement, Executive shall be entitled to the following severance benefits:

(i)  One (1) year of Executive's Base Salary as in effect as of the date of such termination, less applicable withholding, payable in a lump sum within thirty (30) days of the Termination Date;

(ii)  One (1) times Executive's prorated annual bonus as of the date of termination payable in a lump sum within thirty (30) days of the Termination Date;

(iii)  the same level of health (i.e., medical, vision and dental) coverage and benefits as in effect for Executive, and, if applicable, Executive's dependents, on the day immediately preceding the Termination Date; provided, however, that (A) Executive constitutes a qualified beneficiary, as defined in Section 4980B(g)(1) of the Internal Revenue Code of 1986 (the "Code"), as amended; and (B) Executive elects continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 as amended ("COBRA"), within the time period prescribed pursuant to COBRA. The Company shall reimburse Executive's COBRA premiums until the earlier of (x) the date Executive is no longer eligible to receive continuation coverage pursuant to COBRA, (y) six (6) months from the Termination Date or (z) until Executive obtains substantially similar coverage under another employer's group insurance plan.

(b)  Termination Apart from a Change of Control. If the Company terminates Executive's employment other than for Cause or if Executive terminates his employment for Good Reason then, subject to Executive executing and not revoking a standard form of release of claims with the Company and complying with Section 10 of this Agreement, Executive shall be entitled to the following severance benefits:

(i)  Twelve (12) months of Executive's Base Salary as in effect as of the date of such termination, less applicable withholding, payable in a lump sum within thirty (30) days of the Termination Date;

(ii)  One (1) times Executive's prorated annual bonus as of the date of termination payable in a lump sum within thirty (30) days of the Termination Date;

(iii)  the same level of health (i.e., medical, vision and dental) coverage and benefits as in effect for Executive, and, if applicable, Executive's dependents, on the day immediately preceding the Termination Date; provided, however, that (A) Executive constitutes a qualified beneficiary, as defined in Section 4980B(g)(1) of the Code; and (B) Executive elects continuation coverage pursuant to COBRA within the time period prescribed pursuant to COBRA. The Company shall reimburse Executive's COBRA premiums until the earlier of (x) the date Executive is no longer eligible to receive continuation coverage pursuant to COBRA, (y) six (6) months from the Termination Date or (z) until Executive obtains substantially similar coverage under another employer's group insurance plan.

943075_1

-4-

(c)     Termination for Cause or Voluntary Resignation.  If the Company terminates Executive's employment for Cause or if Executive resigns other than for Good Reason, Executive shall be entitled to only those benefits provided under Section 9(d) below.

(d)     Accrued Wages and Vacation; Expenses.  Without regard to the reason for, or the timing of, Executive's termination of employment: (i) Company shall pay Executive any unpaid Base Salary due for periods prior to the Termination Date, (ii) Company shall pay Executive all of Executive's accrued and unused vacation through the Termination Date, and (iii) following submission of proper expense reports by Executive, Company shall reimburse Executive for all expenses reasonably and necessarily incurred by Executive in connection with the business of Company prior to the Termination Date.  These payments shall be made promptly upon termination and within the period of time mandated by law.

10.     Covenant Not to Compete or Solicit.

(a)     Beginning on the Termination Date and ending on the one (1) year anniversary following the Termination Date (the "*Non-Compete Period*"), Executive shall not, other than on behalf of the Company, directly or indirectly, without the prior written consent of Company, engage anywhere in the Geographic Area (as defined below) in (whether as an employee, agent, consultant, advisor, independent contractor, proprietor, partner, officer, director or otherwise), have any ownership interest in (except for passive ownership of one percent (1%) or less of any entity whose securities have been registered under the Securities Act of 1933 or Section 12 of the Securities Exchange Act of 1934), or participate in the financing, operation, management or control of, any firm, partnership, corporation, entity or business that is engaged or participates in, or intends to engage or participate in, any activity or business which is competitive with or of the same nature as, or substantively similar to, an activity or business of the Company or an activity or business in which the Company is engaged (the "*Restricted Business*").

(b)     During the Non-Compete Period, Executive shall not, directly or indirectly, without the prior written consent of the Company, solicit, encourage or take any other action which is intended to induce or encourage, or has the effect of inducing or encouraging, any employee of the Company or any subsidiary of the Company, to terminate his or her employment with the Company or any such subsidiary of the Company.

(c)     During the Non-Compete Period, Executive shall not, directly or indirectly, without the prior written consent of the Company, induce or attempt to induce any of the Company's or the Company's respective customers, suppliers, distributors or contractors to terminate, reduce or otherwise change its relationship with the Company in order to enter into any relationship with Executive or with any other person that engages or participates (or plans to engage or participate) in a Restricted Business.

(d)     The term "*Geographic Area*" shall mean any location in the world where the Company has offices, employees or customers.

(e)     The covenants contained in the preceding paragraphs shall be construed as a series of separate covenants, one for each county, city, state, or any similar subdivision in any Geographic Area. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in the preceding paragraphs. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event that the provisions of this Section 10 are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, permitted by applicable laws.

(f)     Executive acknowledges and agrees that the nature of the businesses of the Company are such that if Executive were to become employed by, or substantially involved in, the business of a competitor of the Company soon after the termination of Executive's employment with the Company, as the case may be, it would be very difficult for Executive not to rely on or use the Company's trade secrets and confidential information.  Executive has agreed to enter into this Agreement to, among other things, avoid the likely disclosure of the Company's trade secrets and confidential information.

(g)     Executive also acknowledges and agrees that the limitations of time, geography, and scope of activity agreed to in this Agreement are reasonable because, among other things, (i) the Company in engaged in highly competitive industries, (ii) Executive will have access to the trade secrets, proprietary and confidential information of the Company, and (iii) in the event Executive's employment with the Company, as the case may be, ended, Executive would be able to obtain suitable and satisfactory employment without violation of this Agreement.

(h)     Executive acknowledges and agrees that it would be impossible or inadequate to measure and calculate the Company's damages from any breach of the covenants set forth in this Section 10. Accordingly, Executive agrees that in the event that Executive breaches any provision of this Section 10, the Company shall be entitled, in addition to any other right or remedy otherwise available, to the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific performance of any such provision of this Agreement. Executive further agrees that no bond or other security shall be required in obtaining such equitable relief, nor will proof of actual damages be required for such equitable relief.  Executive hereby expressly consents to the issuance of such injunction and to the ordering of such specific performance.

11. Successors.

(a)     Company's Successors.  Any successor to the Company (whether direct or indirect and whether by purchase, lease, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business or assets shall assume the Company's obligations under this Agreement and agree expressly in writing to perform the Company's obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term

943073_1

-6-

"Company" shall include any successor to the Company's business or assets which executes and delivers the assumption agreement described in this subsection (a) or which becomes bound by the terms of this Agreement by operation of law.

     (b)   Executive's Successors.  Without the written consent of the Company, Executive shall not assign or transfer this Agreement or any right or obligation under this Agreement to any other person or entity. Notwithstanding the foregoing, the terms of this Agreement and all rights of Executive hereunder shall inure to the benefit of, and be enforceable by, Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

12. Notices.

     (a)   General.  Notices and all other communications contemplated by this Agreement shall be in writing and shall be deemed to have been duly given when personally delivered or when mailed by U.S. registered or certified mail, return receipt requested and postage prepaid. In the case of Executive, mailed notices shall be addressed to Executive at the home address which Executive most recently communicated to the Company in writing. In the case of the Company, mailed notices shall be addressed to its corporate headquarters, and all notices shall be directed to the attention of its Secretary. Notices may also be delivered by facsimile or electronic mail if evidence of receipt is given by the recipient and shall be effective when so received.

     (b)   Notice of Termination.  Any termination by the Company for Cause or by Executive as a result of a voluntary resignation or an Involuntary Termination shall be communicated by a notice of termination to the other party hereto given in accordance with this Section 12. Such notice shall indicate the specific termination provision in this Agreement relied upon, shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination under the provision so indicated, and shall specify the Termination Date (which shall be not more than 30 days after the giving of such notice). The failure by Executive to include in the notice any fact or circumstance which contributes to a showing of Good Reason shall not waive any right of Executive hereunder or preclude Executive from asserting such fact or circumstance in enforcing his rights hereunder.

     13.   Limitation on Payments.  In the event that the severance and other benefits provided for in this Agreement or otherwise payable to Executive (i) constitute "parachute payments" within the meaning of Section 280G of the Code, and (ii) would be subject to the excise tax imposed by Section 4999 of the Code (the "**Excise Tax**"), then Executive's benefits under this Agreement shall be either

     (a)   delivered in full, or

     (b)   delivered as to such lesser extent which would result in no portion of such benefits being subject to the Excise Tax, whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the Excise Tax, results in the receipt by

943073_1

Executive on an after-tax basis, of the greatest amount of benefits, notwithstanding that all or some portion of such benefits may be taxable under Section 4999 of the Code.

Unless the Company and Executive otherwise agree in writing, any determination required under this Section 13 shall be made in writing by the Company's independent public accountants (the "**Accountants**"), whose determination shall be conclusive and binding upon Executive and the Company for all purposes. For purposes of making the calculations required by this Section 13, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Section 280G and 4999 of the Code. The Company and Executive shall furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Section 13. The Company shall bear all costs the Accountants may reasonably incur in connection with any calculations contemplated by this Section 13.

Notwithstanding anything to the contrary in this Agreement, any severance payments to be made to the Executive under this Agreement will not be paid during the six-month period following Executive's termination of employment unless the Company determines, in its good faith judgment, that paying such amounts at the time or times indicated above would not cause Executive to incur an additional tax under Section 409A of the Code (in which case such amounts shall be paid at the time or times indicated above). If the payment of any amounts are delayed as a result of the previous sentence, on the first day following the end of the six-month period, the Company will pay Executive a lump-sum amount equal to the cumulative amounts that would have otherwise been previously paid to Executive under this Agreement. If the Company or Executive believe at any time that any benefits that Executive is entitled to under this agreement do not comply with or are not exempt from Section 409A of the Code, such party will advise the other and both parties will negotiate reasonably and in good faith to amend the terms of this Agreement so that it either complies with or is exempt from Section 409A of the Code.

14. Arbitration.

(a) Any dispute or controversy arising out of, relating to, or in connection with this Agreement, or the interpretation, validity, construction, performance, breach, or termination thereof, shall be settled by binding arbitration to be held in Salt Lake City, Utah, in accordance with the National Rules for the Resolution of Employment Disputes then in effect of the American Arbitration Association (the "**Rules**"). The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction.

(b) The arbitrator(s) shall apply Utah law to the merits of any dispute or claim, without reference to conflicts of law rules. The arbitration proceedings shall be governed by federal arbitration law and by the Rules, without reference to state arbitration law. Executive hereby consents to the personal jurisdiction of the state and federal courts located in Utah for any action or proceeding arising from or relating to this Agreement or relating to any arbitration in which the parties are participants.

(c)     Executive understands that nothing in this Section modifies Executive's at will employment status.    Either Executive or the Company can terminate the employment relationship at any time, with or without Cause.

(d)     EXECUTIVE HAS READ AND UNDERSTANDS THIS SECTION, WHICH DISCUSSES ARBITRATION. EXECUTIVE UNDERSTANDS THAT SUBMITTING ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, OR THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION THEREOF TO BINDING ARBITRATION CONSTITUTES A WAIVER OF EXECUTIVE'S RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE EMPLOYER/EMPLOYEE RELATIONSHIP, INCLUDING BUT NOT LIMITED TO, THE FOLLOWING CLAIMS:

(i)     ANY AND ALL CLAIMS FOR WRONGFUL DISCHARGE OF EMPLOYMENT; BREACH OF CONTRACT, BOTH EXPRESS AND IMPLIED; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, BOTH EXPRESS AND IMPLIED; NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; NEGLIGENT OR INTENTIONAL MISREPRESENTATION; NEGLIGENT OR INTENTIONAL INTERFERENCE WITH CONTRACT OR PROSPECTIVE ECONOMIC ADVANTAGE; AND DEFAMATION.

(ii)     ANY AND ALL CLAIMS FOR VIOLATION OF ANY FEDERAL, STATE OR MUNICIPAL STATUTE OF ANY JURISDICTION, INCLUDING, BUT NOT LIMITED TO, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE CIVIL RIGHTS ACT OF 1991, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE FAIR LABOR STANDARDS ACT, THE FAIR CREDIT REPORTING ACT; EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, THE FAMILY AND MEDICAL LEAVE ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT AND THE OLDER WORKERS BENEFIT PROTECTION ACT.

(iii)     ANY AND ALL CLAIMS ARISING OUT OF ANY OTHER LAWS AND REGULATIONS RELATING TO EMPLOYMENT OR EMPLOYMENT DISCRIMINATION.

15. Miscellaneous Provisions.

(a)     No Duty to Mitigate.  Executive shall not be required to mitigate the amount of any payment contemplated by this Agreement, nor shall any such payment be reduced by any earnings that Executive may receive from any other source.

(b)     Waiver.  No provision of this Agreement may be modified, waived or discharged unless the modification, waiver or discharge is agreed to in writing and signed by Executive and by an authorized officer of the Company (other than Executive). No waiver by either party of any breach of, or of compliance with, any condition or provision of this Agreement by the

943073_1

-9-

other party shall be considered a waiver of any other condition or provision or of the same condition or provision at another time.

        (c)    <u>Integration</u>. This Agreement and any outstanding stock option agreements and restricted stock purchase agreements represent the entire agreement and understanding between the parties as to the subject matter herein and supersede all prior or contemporaneous agreements, whether written or oral, with respect to this Agreement and any stock option agreement or restricted stock purchase agreement.

        (d)    <u>Choice of Law</u>. The validity, interpretation, construction and performance of this Agreement shall be governed by the internal substantive laws, but not the conflicts of law rules, of the State of Utah.

        (e)    <u>Severability</u>. The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision hereof, which shall remain in full force and effect.

        (f)    <u>Employment Taxes</u>. All payments made pursuant to this Agreement shall be subject to withholding of applicable income and employment taxes.

        (g)    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

*[Signature page follows]*

943073_1

-10-

2007-08-3109:03          The DeWindts   1-949-486-3731>>      18015327549                                    P 9/15

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the
Company by its duly authorized officer, as of the day and year first above written.

**COMPANY:**                         **VARCITY, INC.**

D. Stephen DeWindt
President and Chief Executive Officer

**EXECUTIVE:**

David R. Taylor

*[SIGNATURE PAGE TO EMPLOYMENT AGREEMENT]*

[ 5.3.2 ] [Employment Agreement.David Taylor.pdf] [Page 11 of 12]

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by its duly authorized officer, as of the day and year first above written.

**COMPANY:**                                    **VARCITY, INC.**

_____

D. Stephen DeWindt
President and Chief Executive Officer

**EXECUTIVE:**                                  _____

David R. Taylor

*[SIGNATURE PAGE TO EMPLOYMENT AGREEMENT]*

# Exhibit B






**STOEL**
**RIVES**
LLP
ATTORNEYS AT LAW

201 S. Main Street, Suite 1100
Salt Lake City, Utah 84111
main 801.328.3131
fax 801.578.6999
www.stoel.com

MATTHEW M. DURHAM
*Direct (801) 578-6984*
mmdurham@stoel.com

October 29, 2009

**BY FIRST CLASS MAIL AND EMAIL**

Andrew Hyde
Chief Financial Officer
Sparxent, Inc.
2795 E. Cottonwood Parkway
Suite 360
Salt Lake City, Utah 84121

**Re:    David R. Taylor**

Dear Mr. Ekstrom:

This firm represents David R. Taylor, formerly the Chief Marketing Officer at Sparxent, Inc. ("Sparxent").

As you know, Mr. Taylor is party to a contract of employment (the "Employment Contract") with Sparxent, a copy of which is attached. Under the Employment Contract, Mr. Taylor is entitled to certain severance benefits if his employment is terminated "Without Cause," or if he terminates his employment for "Good Reason." *See* Employment Contract ¶ 1, ¶ 9. The Employment Contract provides that, under such circumstances, Mr. Taylor is entitled to twelve months of his base salary, his prorated bonus to the date of termination and continuation of health insurance benefits at Sparxent's expense. In addition to these severance benefits, Mr. Taylor is also entitled to his accrued salary, unused sick and vacation pay, and any unpaid or deferred compensation or bonuses that he has not been paid. Finally, he is entitled to any other retirement or stock benefits or compensation which he has earned or for which he is eligible under relevant plans or programs at Sparxent.

As you also know, Mr. Taylor was informed on October 19, 2009 that his employment at Sparxent was being terminated. This message was communicated to Mr. Taylor by Steve DeWindt, formerly the CEO of Sparxent, who said this decision was made by Ed Ekstrom. Mr. DeWindt did not provide Mr. Taylor with any reason for this decision; indeed, Mr. Taylor has never been told that his job performance at Sparxent was deficient or that he was not meeting the company's expectations. Under these circumstances, Mr. Taylor can only conclude that his employment with Sparxent has been terminated without cause.

Oregon   Washington
California   Utah   Idaho   Colorado   Minnesota



Andrew Hyde
October 29, 2009
Page 2

The company has been less than forthcoming with information regarding the termination of Mr. Taylor's employment. For example, while it was clearly stated to him that his employment at Sparxent was ending, no effective date for this decision was officially communicated to him. Mr. Taylor was told, however, that his Sparxent email account would be discontinued on October 23rd and that he should destroy his corporate American Express card. In addition he was told that Ashley Leonard would become the President/COO of Sparxent and that she, not Mr. Taylor, would be the primary contact with companies in Sparxent's acquisitions queue.

Sparxent's lack of communication has led to confusion and concern on Mr. Taylor's part. Among other things, Mr. Taylor is concerned that, despite his clear understanding that his employment has been terminated without cause, Sparxent may claim some other understanding. This lack of clarity places Mr. Taylor in an uncomfortable position, since the Employment Contract gives him a very limited amount time in which to exercise his right to voluntarily resign for good cause and protect his rights under the agreement. Consequently, if Sparxent now takes the position that Mr. Taylor's employment has not been terminated, then Mr. Taylor hereby voluntarily resigns for good cause, effective immediately, because there has been a material diminution in his duties and responsibilities at Sparxent.

I look forward to discussing with you Sparxent's payment of Mr. Taylor's severance benefit. Please contact me at the number listed above.

Very truly yours,

Matthew M. Durham

MMD:sh
Enclosure
cc:    David Taylor

# Exhibit C



201 S. Main Street, Suite 1100
Salt Lake City, Utah 84111
main 801.328.3131
fax 801.578.6999
www.stoel.com

MATTHEW M. DURHAM
*Direct (801) 578-6984*
mmdurham@stoel.com

March 10, 2010

## BY FIRST CLASS MAIL AND EMAIL

Andrew Hyde
Chief Financial Officer
Sparxent, Inc.
2795 E. Cottonwood Parkway
Suite 360
Salt Lake City, Utah 84121

**Re:    David R. Taylor**

Dear Mr. Hyde:

In my letter dated October 29, 2009, I indicated David Taylor understands that he was terminated without cause by Sparxent, Inc. ("Sparxent") and requested further discussion with Sparxent about payment of Mr. Taylor's severance benefits. Ed Ekstrom has since called Mr. Taylor and acknowledged receipt of the letter dated October 29, 2009, but at no time has Sparxent communicated its disagreement with Mr. Taylor's understanding as set forth in that letter. Mr. Taylor therefore assumes that he was in fact terminated without cause by Sparxent.

Mr. Taylor is therefore entitled to the severance benefits provided in his employment agreement with Sparxent. Under the employment agreement, Mr. Taylor is entitled to $38,461 for accrued and unpaid salary prior to termination of his employment, $49,488 for accrued and unpaid bonus from 2008, $7,692 for accrued and unpaid vacation, $200,000 for twelve months of his base salary, and $166,666 for his pro-rated 2009 bonus, totaling of $462,307. (*See* Employment Agreement Sections 9(b), 9(d).)

As you know, Mr. Taylor has continued to receive some payments from Sparxent equivalent to his previous salary. To date he has received payment from Sparxent in the amount of $37,260.27 since termination of his employment in October. While Mr. Taylor is willing to accept these amounts as payment toward the severance benefits Sparxent owes him, reducing the amount to $425,046.73, his acceptance in no way waives any right to the severance benefits to which Mr. Taylor is entitled under his employment contract with Sparxent.

Oregon  Washington
California  Utah  Idaho  Colorado  Minnesota



Andrew Hyde
March 10, 2010
Page 2

Although we recognize that Sparxent is facing present challenges, ultimately Sparxent must fulfill its contractual obligations to Mr. Taylor and pay the remaining $425,046.73 to which Mr. Taylor is entitled. In fact, the Employment Agreement contemplates a lump-sum payment of severance benefits, which Mr. Taylor hereby demands. Sparxent's failure to timely make this payment will require Mr. Taylor to exercise his legal rights and seek recovery for damages, costs and interest.

Please feel free to contact me at the number listed above to discuss.

Very truly yours,

Matthew M. Durham

cc: David R. Taylor

# Exhibit D

<div align="center">

MINUTES OF A MEETING

OF THE BOARD OF DIRECTORS OF

VARCITY, INC.

June 27, 2008

</div>

Pursuant to notice duly given, a telephonic meeting of the Board of Directors (the "**Board**") of VARCity, Inc., a Delaware corporation (the "**Company**"), was held on June 27, 2008 commencing at approximately 1:45 p.m. Mountain Time.  Participating were directors Steve DeWindt, David Taylor and Ed Ekstrom.  Also present was Matt Wells of Ray Quinney & Nebeker P.C., counsel to the Company ("RQN").  Mr. DeWindt called the meeting to order and as all directors were present at the commencement of the meeting Mr. DeWindt declared that a quorum was present.  Mr. Wells acted as secretary of the meeting.

Mr. DeWindt reported on matters relating to the proposed Series A-1 and A-2 Preferred Stock financing pursuant to the resolutions and agreements previously circulated to the Board.  Upon motion duly made and seconded, the Board approved the following resolutions:

<u>REFINANCING OF INDEBTEDNESS; AUTHORIZATION OF FINANCING</u>

**WHEREAS,** the Board of Directors (the "**Board**") of VARCity, Inc. (the "**Company**") previously authorized the Company to issue to vSpring III, L.P. (the "**Lender**") convertible promissory notes styled Note No. 2008-1 issued to Lender on January 11, 2008 in a principal amount of $2,500,000 and Note No. 2008-2 issued to Lender on February 29, 2008 in a principal amount of $250,000 (collectively, the "**Prior Notes**").

**WHEREAS,** Lender has made an additional advance to the Company on May 7, 2008 in an amount of $250,000 (the "**Prior Indebtedness**").

**WHEREAS,** inasmuch as the Prior Notes have matured and in order to consolidate and document the terms of the Prior Indebtedness, the Board deems it advisable, and in the best interests of the Company and its stockholders, to issue to Lender a new convertible promissory note in the

principal amount of $3,000,000 in substantially the form attached hereto as <u>Exhibit A</u> (the "Convertible Note").

WHEREAS, the Board deems it advisable, and in the best interests of the Company and its stockholders, to engage in an equity financing whereby it will issue shares of newly designated Series A-1 and Series A-2 Preferred Stock to various Investors, as defined below, in exchange for cash and conversion of indebtedness (the "Financing").

WHEREAS, Section 144 of the Delaware General Corporation Law provides that certain contracts or transactions (any such contract or transaction, an "Interested Party Transaction") between a corporation and any of its directors or another entity of which any of its directors is a director or in which any of its directors has a material financial interest (any such party, an "Interested Party") are not void or voidable under certain circumstances (the "Interested Party Transaction Safe Harbor").

WHEREAS, the availability of the Interested Party Transaction Safe Harbor for the Convertible Note and the Financing is conditioned on, among other things, (i) the material facts as to the director's relationship or interest and as to the transaction are disclosed or are known to the board of directors and (ii) the board in good faith authorizes the transaction by the affirmative votes of a majority of the disinterested directors.

WHEREAS, the Board acknowledges that (i) Ed Ekstrom, a director of the Company, is an affiliate of, and has a financial interest in, vSpring III, L.P., which is the Lender and will be the lead Investor in the Financing, (ii) David R. Taylor a director of the Company, will participate as an Investor in the Financing, and (iii) the foregoing render each of the Convertible Note and the Financing an Interested Party Transaction.

WHEREAS, the Board has reviewed, evaluated and discussed with the officers of the Company (i) the material facts, terms and conditions of each Interested Party Transaction, (ii) the rights and obligations of the Company, the Board, the stockholders of the Company and other parties in connection therewith, (iii) the costs, obligations, requirements (financial or otherwise) and other factors and considerations required by each Interested Party Transaction, (iv) the Company's financing objectives and financial situation, and (v) the nature of the relationships and interests of each Interested Party with and in the Company in connection with each Interested Party Transaction.

NOW, THEREFORE, BE IT RESOLVED: That after due inquiry, the Board (with Mr. Ekstrom and Mr. Taylor abstaining as to the applicable Interested Party Transaction) believes that each Interested Party Transaction is appropriate for, in the best interests of, and advisable, just and reasonable to the Company and, in the exercise of its fiduciary duty, hereby approves each Interested Party Transaction and related matters as follows:

ISSUANCE OF CONVERTIBLE NOTE

RESOLVED FURTHER: That the Board hereby approves the form of the Convertible Note in substantially the form attached hereto as <u>Exhibit A</u>.

-2-

**RESOLVED FURTHER:** That the Board hereby authorizes and empowers the officers of the Company to execute and deliver the Convertible Note, along with such changes and modifications as they, in consultation with legal counsel, may consider necessary or appropriate, with such approval evidenced by their signatures thereon.

**RESOLVED FURTHER:** That the Board hereby authorizes and empowers the officers of the Company and the attorneys of Ray Quinney & Nebeker to execute and file any filings required under state or federal securities laws in connection with the issuance of the Convertible Note.

**RESOLVED FURTHER:** That the Board hereby approves and ratifies all actions taken by the officers of the Company in connection with the Convertible Note prior to this meeting as valid and authorized actions of the Company.

## AUTHORIZATION OF AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

**RESOLVED FURTHER:** That the Company amend and restate its Certificate of Incorporation to (i) change the name of the Company to "Sparxent, Inc." (ii) increase the authorized number of shares of Common Stock to 15,000,000, (iii) create a new class of stock, designated "Preferred Stock" consisting of 5,455,000 authorized shares, (iv) create a new series of Preferred Stock, designated Series A-1 Preferred Stock, consisting of 4,805,000 authorized shares, (v) create a new series of Preferred Stock, designated Series A-2 Preferred Stock, consisting of 650,000 authorized shares, (vi) establish the rights, preferences, privileges and restrictions of the Preferred Stock, and (vii) make certain other changes.

**RESOLVED FURTHER:** That the Company's Amended and Restated Certificate of Incorporation, in the form attached hereto as **Exhibit B** (the "Restated Certificate"), is hereby approved, adopted and confirmed.

**RESOLVED FURTHER:** That the officers of the Company and any designee of such officers (the "Authorized Officers") be, and each of them hereby is, individually authorized to solicit the approval of the Company's stockholders of the Restated Certificate and, upon receipt of such approval, to execute in the name and on behalf of the Company the Restated Certificate and take all such action as such persons deem necessary or desirable to file the Restated Certificate with the Secretary of State of Delaware and to cause the Restated Certificate to become effective.

## AUTHORIZATION OF AMENDED AND RESTATED BYLAWS

**RESOLVED FURTHER:** That the Company amend and restate its Bylaws to (i) change the name of the Company to "Sparxent, Inc." and (ii) make certain other changes.

**RESOLVED FURTHER:** That the Company's Amended and Restated Bylaws, in the form attached hereto as **Exhibit C**, are hereby approved, adopted and confirmed.

**RESOLVED FURTHER:** That the Secretary or Assistant Secretary of the Company is hereby authorized and directed to execute a certificate of the amendment of the Bylaws and

-3-

insert such certificate and the Bylaws in the minute book of the Company, and that the officers of the Company are ordered to maintain a copy of such Bylaws in the principal office of the Company open for inspection by the stockholders at all reasonable times during office hours.

## SALE AND ISSUANCE OF SHARES

**RESOLVED FURTHER:** That the Company sell and issue up to 4,805,000 shares of Series A-1 Preferred Stock (the "**Shares**") at a purchase price of $3.60 per share to certain "accredited investors" (the "**Investors**"), as that term is defined in the Securities Act of 1933, as amended, pursuant to the Purchase Agreement (as defined below).

**RESOLVED FURTHER:** That the Board hereby approves the purchase price of $3.60 per Share and deems it to be good, fair and valuable consideration and reasonably equivalent value for each Share.

**RESOLVED FURTHER:** That the Company sell and issue up to 633,803 shares of Series A-2 Preferred Stock (the "**Shares**") at a purchase price of $4.26 per share to certain "accredited investors" pursuant to the Purchase Agreement.

**RESOLVED FURTHER:** That the Board hereby approves the purchase price of $4.26 per Share and deems it to be good, fair and valuable consideration and reasonably equivalent value for each Share.

**RESOLVED FURTHER:** That the Authorized Officers be, and each of them hereby is, individually authorized and empowered to execute and deliver, in the name and on behalf of the Company all documents relating to the Financing (the "**Financing Documents**") including, without limitation:

(i)     The Series A-1 and Series A-2 Preferred Stock Purchase Agreement (the "**Purchase Agreement**"), substantially in the form attached hereto as **Exhibit D**.

(ii)     The Investor Rights Agreement (the "**Investor Rights Agreement**"), substantially in the form attached hereto as **Exhibit E**.

(iii)     The Voting Agreement (the "**Voting Agreement**"), substantially in the form attached hereto as **Exhibit F**.

(iv)     The Right of First Refusal and Co-Sale Agreement (the "**ROFR Agreement**"), substantially in the form attached hereto as **Exhibit G**.

(v)     The Management Rights Letter (the "**Management Rights Letter**"), substantially in the form attached hereto as **Exhibit H**.

(vi)     Such other documents, certificates, instruments and agreements contemplated by the agreements listed above or deemed necessary by the Authorized Officers to consummate the transactions contemplated thereby and from time to time to amend or

-4-

modify any of the Financing Documents in such manner and form, as any Authorized Officer shall approve.

**RESOLVED FURTHER:** That all of the terms, provisions, and conditions included or to be included in the Financing Documents are hereby ratified and approved in all respects, with such changes as may be approved by any Authorized Officer, such approval to be conclusively evidenced by the execution and delivery of any of the foregoing by any such Authorized Officer.

**RESOLVED FURTHER:** That the Board hereby reserves: (i) 4,805,000 shares of Series A-1 Preferred Stock for issuance upon purchase pursuant to the Purchase Agreement; (ii) 650,000 shares of Series A-2 Preferred Stock for issuance upon purchase pursuant to the Purchase Agreement; and (iii) 5,455,000 shares of Common Stock (as may be adjusted in accordance with the provisions of the Restated Certificate) for issuance upon conversion of the Company's Preferred Stock.

**RESOLVED FURTHER:** That the Shares shall be validly issued, fully paid and nonassessable when issued in accordance with the terms of the Purchase Agreement.

**RESOLVED FURTHER:** That the shares of Common Stock (and any additional shares of capital stock as may be necessary to issue pursuant to the terms of the Series A-1 and Series A-2 Preferred Stock) issuable upon conversion of the Shares shall be validly issued, fully paid and nonassessable when issued in accordance with the terms of the Restated Certificate.

**RESOLVED FURTHER:** That the Authorized Officers are authorized and empowered to execute and deliver all documents and take whatever actions are deemed necessary or advisable to comply with all applicable state and federal securities laws.

**RESOLVED FURTHER:** That the Authorized Officers be, and each of them hereby is, authorized and empowered, for and in the name and on behalf of the Company, to execute and deliver, to the appropriate parties, the Financing Documents, substantially in the form submitted to and reviewed by the Board, with such changes therein or additions thereto as the officer executing the same shall approve with the advice of legal counsel, the execution and delivery of such agreements by such officer to be conclusive evidence of the approval of the Board thereof and all matters relating thereto.

## BLUE SKY MATTERS

**RESOLVED FURTHER:** That the proper officers of the Company shall consult with legal counsel and shall take such actions as are necessary to secure an exemption from registration under the Securities Act of 1933 for the Preferred Stock and the securities issuable upon conversion of the Preferred Stock in each state in which such securities are offered and sold.

**RESOLVED FURTHER:** That the proper officers of the Company are authorized and empowered, if deemed by them appropriate to do so, upon advice of counsel, to file a notice on Form D with the Securities and Exchange Commission or any states, as appropriate, respecting the offering.

-5-

RESOLVED FURTHER: That the proper officers of the Company are hereby authorized, and empowered to execute, seal, attest, acknowledge, and deliver such documents, applications, and other instruments for the registration or other qualification of the Preferred Stock, or for the attainment of an exemption from such registration or qualification as they may deem necessary or advisable in order to permit the sale of such securities under the "blue sky" or other securities laws of any state in the United States and for this purpose, the proper officers of the Company are hereby authorized and empowered to execute, seal, attest, acknowledge, and deliver, in the name and on behalf of the Company, such consents to service of process, issuer's covenants, powers of attorney, and other documents, and each and every resolution required to be adopted by any legislation or law, or by any order or regulation of any governmental body or agency, in any state or jurisdiction wherein such securities may be registered, qualified, or offered for sale, shall be deemed to be and the same hereby is, adopted, approved, and confirmed, and that all action heretofore taken by the officers of the Company with respect to such registration, qualification, or exemption is ratified, approved, and confirmed.

## INDEMNIFICATION AGREEMENTS

WHEREAS, the Board has determined that it is in the best interests of the Company and its stockholders to enter into indemnification agreements in connection with the Financing.

NOW, THEREFORE, BE IT RESOLVED: That the Board hereby approves the execution of indemnification agreements to be entered into between the Company and certain of its directors and their affiliated fund in connection with the Financing, in substantially the form attached hereto as **Exhibit I** (the "**Indemnification Agreement**").

RESOLVED FURTHER: That the Authorized Officers are hereby authorized to solicit and obtain the approval of the Company's stockholders with respect to the Indemnification Agreement.

## STOCK RESTRICTION AGREEMENTS

WHEREAS, it is a condition to the Closing of the Financing that the Company enter into Stock Restriction Agreements with its current stockholders.

NOW, THEREFORE, BE IT RESOLVED: That the Board deems it appropriate and in the best interests of the Company to enter into a Stock Restriction Agreement in substantially the form attached hereto as **Exhibit J** (each a "**Stock Restriction Agreement**"), with each of Steve DeWindt and David R. Taylor.

RESOLVED FURTHER: That the Authorized Officers be, and each of them hereby is, individually authorized and empowered to execute and deliver, in the name and on behalf of the Company each Stock Restriction Agreement, with such changes therein or additions thereto as the officer executing the same shall approve with the advice of legal counsel, the execution and delivery of such agreements by such officer to be conclusive evidence of the approval of the Board thereof and all matters relating thereto.

-6-

AUTHORIZATION AND APPOINTMENT OF DIRECTORS

**WHEREAS,** the Board deems it advisable, and in the best interests of the Company, and its stockholders, to increase the number of directors as required pursuant to the Voting Agreement, which is a condition to the closing of the Financing pursuant to the Purchase Agreement (the "*Closing*").

**NOW, THEREFORE, BE IT RESOLVED:** That, effective upon the Closing, the authorized number of directors within the limits specified in the Company's Bylaws shall be, and hereby is, increased to five (5).

**RESOLVED FURTHER:** That, effective upon the Closing, Jeron Paul is hereby appointed to serve as a member of the Board until the next annual meeting of stockholders of the Company and until his successor is duly elected and qualified or until his earlier death, resignation or removal.

**RESOLVED FURTHER:** That, effective upon the Closing, the Company's Board of Directors shall consist of the following individuals with each holding the position in accordance with the Voting Agreement indicated in parenthesis:

| | | |
|---|---|---|
| 1) | Steve DeWindt | (Common Designee) |
| 2) | David R. Taylor | (Common Designee) |
| 3) | Ed Ekstrom | (Series A Designee) |
| 4) | Jeron Paul | (Series A Designee) |
| 5) | (Vacant) | (Mutual Director) |

OMNIBUS RESOLUTIONS

**RESOLVED:** That, in order to fully carry out the intent and effectuate the purposes of the foregoing resolutions, the Authorized Officers be, and each of them hereby is, individually authorized in the name and on behalf of the Company from time to time (i) to prepare, execute, deliver and perform, as the case may be, such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertakings, (ii) to pay or cause to be paid on behalf of the Company any related costs and expenses and (iii) to take such other actions, in the name and on behalf of the Company, as each such Authorized Officer, in such person's discretion, shall deem necessary or advisable to complete and effect the foregoing transactions or to carry out the intent and purposes of the foregoing resolutions and the transactions contemplated thereby, the preparation, execution, delivery and performance of any such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertakings, the payment of any such costs or expenses and the performance of any such other acts shall be conclusive evidence of the approval of the Board thereof and all matters relating thereto.

-7-

**RESOLVED FURTHER:** That all actions heretofore taken by the officers and directors of the Company with respect to the foregoing transactions and all other matters contemplated by the foregoing resolutions are hereby approved, adopted, ratified and confirmed.

There being no further business, on a motion duly made and seconded, there being no objections, the meeting was adjourned at approximately 2:15 p.m. MDT.

_____
Matt Wells, Secretary of the Meeting

-8-

Matthew M. Durham (6214)
Cameron L. Ward (12271)
STOEL RIVES LLP
201 S Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone: (801) 328-3131

Attorneys for Plaintiff

IN THE THIRD JUDICIAL DISTRICT COURT IN AND FOR

SALT LAKE COUNTY, STATE OF UTAH

DAVID R. TAYLOR, an individual,

Plaintiff,

v.

SPARXENT, INC., a Delaware
corporation,

Defendants.

**ACCEPTANCE OF SERVICE OF
PROCESS**

Case No.: 100917452

Judge Robert K. Hilder

Pursuant to Rule 4, Utah R. Civ. P., Kevin N. Anderson, Fabian & Clendenin, 215 So.
State Street, Suite 1200, Salt Lake City, Utah 84111, acknowledges his authority to and does
hereby accept service of process on behalf of Defendant Sparxent, Inc. as if Defendant was
personally served on the date of this acceptance. Defendant will retain all defenses or objections
to the lawsuit or to the jurisdiction or venue of the Court except for objections based on a defect
in the summons or in the service of the summons. Defendant shall have twenty (20) days from
the date of this acceptance to file their answer or motion under Rule 12 and understand that a

judgment may be entered against them if they fail to do so.

DATED: September 21st, 2010.

FABIAN & CLENDENIN

Kevin N. Anderson
Attorney for Defendant

4.    For such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Mr. Taylor hereby demands a trial by jury on all issues in this action triable of right

by a jury.

DATED: September 16, 2010.

STOEL RIVES LLP

Matthew M. Durham
Cameron L. Ward

Attorneys for Plaintiff

Plaintiff's Address:

David R. Taylor
531 S. Arnold Court
Alpine, UT 84004

Kevin N. Anderson, 0100
Scott M. Petersen, 7599
FABIAN & CLENDENIN,
 A Professional Corporation
215 South State Street, Suite 1200
Salt Lake City, Utah 841111-2323
Telephone: (801) 531-8900
kanderson@fabianlaw.com
spetersen@fabianlaw.com

*Attorneys for Defendant Sparxent, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| DAVID R. TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | **DECLARATION OF ANDREW HYDE** |
| | ) | |
| vs. | ) | |
| | ) | **Civil No.** _____ |
| SPARXENT, INC., a Delaware | ) | |
| corporation, | ) | **Judge:** _____ |
| | ) | |
| Defendant. | ) | |

I, Andrew Hyde, make the following statement under the penalty of perjury of the laws of

the United States of America and the laws of the State of Utah.

     1.       I have personal knowledge of the facts contained herein.

     2.       Since October 13, 2008, I have been the CFO of Sparxent, Inc.

     3.       Sparxent, Inc. is incorporated as a Delaware corporation.

     4.       Sparxent, Inc. maintains its headquarters at 1825 South Grant St., Suite #210, San

Mateo, CA, 94402.

5.      The offices of both the CFO and the CEO are located at its headquarters in San

Mateo, California.

6.      It is from California that Sparxent, Inc. directs its day-to-day activities, including

coordinating the activities of its international offices, negotiating its contracts, working with

Sparxent vendors, carrying out business planning and operations, and performing Sparxent

Human Resource functions.

7.      Sparxent does not direct its corporate activities from Utah.

DATED this _12th_ day of October, 2010.

_____
Andrew Hyde

2

≈JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

DAVID R. TAYLOR

## DEFENDANTS

SPARXENT, INC.

**(b)** County of Residence of First Listed Plaintiff   Utah
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   San Mateo, CA
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Matthew M. Durham, Cameron L. Ward
STOEL RIVES, LLP
201 S. Main Street, Suite 1100, Salt Lake City, UT 84111  (801) 328-3131

Attorneys (If Known)
Kevin N. Anderson, Scott M. Petersen
Fabian & Clendenin
215 S. State Street, Suite 1200, Salt Lake City, UT  84111-2323

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding    ☒ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S. C. §§ 1332(a)(1), 1441 and 1446(b)
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE  Robert K. Hilder     DOCKET NUMBER  100917452

DATE
10/12/2010

SIGNATURE OF ATTORNEY OF RECORD
Scott M. P.

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE



Matthew M. Durham (6214)
Cameron L. Ward (12271)
STOEL RIVES LLP
201 S Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone: (801) 328-3131

FILED
DISTRICT COURT
2010 SEP 21  PM 3: 24
SALT LAKE COUNTY
BY _____
            DEPUTY CLERK

Attorneys for Plaintiff

IN THE THIRD JUDICIAL DISTRICT COURT IN AND FOR

SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| DAVID R. TAYLOR, an individual, <br><br> Plaintiff, <br><br> v. <br><br> SPARXENT, INC., a Delaware corporation, <br><br> Defendants. | **ACCEPTANCE OF SERVICE OF PROCESS** <br><br> Case No.: 100917452 <br><br> Judge Robert K. Hilder |

Pursuant to Rule 4, Utah R. Civ. P., Kevin N. Anderson, Fabian & Clendenin, 215 So.

State Street, Suite 1200, Salt Lake City, Utah 84111, acknowledges his authority to and does

hereby accept service of process on behalf of Defendant Sparxent, Inc. as if Defendant was

personally served on the date of this acceptance.  Defendant will retain all defenses or objections

to the lawsuit or to the jurisdiction or venue of the Court except for objections based on a defect

in the summons or in the service of the summons.  Defendant shall have twenty (20) days from

the date of this acceptance to file their answer or motion under Rule 12 and understand that a

judgment may be entered against them if they fail to do so.

     DATED: September 21st, 2010.

                       FABIAN & CLENDENIN

                       Kevin N. Anderson
                       Attorney for Defendant



FILED
DISTRICT COURT

10 SEP 16 AM 11: 15

THIRD JUDICIAL DISTRICT
SALT LAKE COUNTY

BY _____ M.V.
DEPUTY CLERK

Matthew M. Durham (6214)
Cameron L. Ward (12271)
STOEL RIVES LLP
201 S Main Street, Suite 1100
Salt Lake City, UT  84111
Telephone:  (801) 328-3131

Attorneys for Plaintiff

250´
360´

IN THE THIRD JUDICIAL DISTRICT COURT IN AND FOR

SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| DAVID R. TAYLOR, an individual, | **COMPLAINT** |
| Plaintiff, | **(JURY TRIAL DEMANDED)** |
| v. | |
| SPARXENT, INC., a Delaware corporation, | Civil No. 100917452 |
| Defendant. | The Honorable Hilder |

Plaintiff David R. Taylor ("Mr. Taylor") alleges and complains against Defendant

Sparxent, Inc. ("Sparxent") as follows:

## PARTIES

1.      Mr. Taylor is an individual residing in Alpine, Utah.

2.      On information and belief, Sparxent is a corporation organized and existing under

the laws of the State of Delaware with its principal place of business located at 2795 East

Cottonwood Parkway, Suite 360, Salt Lake City, Utah 84121.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to Utah Code Ann. §§ 78A-5-102 (2008).

4.      Venue is proper in this Court pursuant to Utah Code Ann. §§ 78B-3-304 and 78B-3-307 (2008).

## GENERAL ALLEGATIONS

5.      On or about August 31, 2007, Mr. Taylor entered into an Employment Agreement with Sparxent.[1] A true and correct copy of the Employment Agreement is attached hereto as Exhibit A and incorporated herein.

6.      Pursuant to the Employment Agreement, Mr. Taylor is entitled to certain severance benefits if his employment is terminated without "Cause," or if he terminates his employment for "Good Reason." *See* Employment Agreement, §§ 1, 9.

7.      Specifically, pursuant to Section 9 of the Employment Agreement: "If [Sparxent] terminates [Mr. Taylor's] employment other than for Cause or if [Mr. Taylor] terminates his employment for Good Reason then, subject to [Mr. Taylor] executing and not revoking a standard form of release of claims with [Sparxent] and complying with Section 10 of this

---

[1] At the time Mr. Taylor executed the Employment Agreement, Sparxent was operating under the name of VARCity, Inc. as indicated in the Employment Agreement. On or about June 27, 2008, however, VARCITY, Inc. amended and restated its certificate of incorporation and bylaws to, among other things, change the name of the company from VARCity, Inc. to Sparxent, Inc. *See* VARCity, Inc.'s Board Minutes, dated June 27, 2008, attached hereto as Exhibit D. Thus, any reference to VARCity, Inc. or the "Company" in the Employment Agreement is a reference to Sparxent, Inc.

Agreement, [Mr. Taylor] shall be entitled to the following severance benefits: (i) Twelve (12) months of [Mr. Taylor's] Base Salary as in effect as of the date of such termination, less applicable withholding, payable in a lump sum within thirty (30) days of the Termination Date; (ii) One (1) times [Mr. Taylor's] prorated annual bonus as of the date of termination payable in a lump sum within thirty (30) days of the Termination Date; (iii) the same level of health . . . coverage and benefit as in effect for [Mr. Taylor], and, if applicable, [Mr. Taylor's] dependents, . . . ." *Id.* § 9(b)(i)-(iii).

8.      Section 9 of the Employment Agreement further provides that "Without regard to the reason for, or the timing of, [Mr. Taylor's] termination of employment: (i) [Sparxent] shall pay [Mr. Taylor] any unpaid Base Salary due for periods prior to the Termination Date, (ii) [Sparxent] shall pay [Mr. Taylor] all of [his] accrued and unused vacation through the Termination Date, and (iii) following submission of proper expense reports by [Mr. Taylor], [Sparxent] shall reimburse [Mr. Taylor] for all expenses reasonably and necessarily incurred by [Mr. Taylor] in connection with the business of [Sparxent] prior to the Termination Date.  These payments shall be made promptly upon termination and within the period of time mandated by law." *Id.* § 9(d).

9.      Under the Employment Agreement "'Cause' is defined as (i) an act of dishonesty by [Mr. Taylor] in connection with [Mr. Taylor's] responsibilities as an employee, (ii) [Mr. Taylor's] conviction of, or plea of *nolo contendere* to, a felony, (iii) [Mr. Taylor's] gross misconduct, (iv), [Mr. Taylor's] continued substantial nonperformance of [his] employment duties hereunder fifteen (15) days after [Mr. Taylor] has received a written demand for

performance from [Sparxent] which describes the basis for [Sparxent's] belief that [Mr. Taylor] has not substantially performed [his] duties, or (v) [Mr. Taylor's] breaching, in any material respect, the terms of this Agreement or any confidentiality or proprietary information agreement with [Sparxent]." *Id.* § 1(a).

      10.    Pursuant to the Employment Agreement "'Good Reason' shall mean the voluntary termination of employment by [Mr. Taylor] within two (2) weeks of the occurrence of any of the following events, without [Mr. Taylor's] express written consent: (i) any material diminution in [Mr. Taylor's] duties or responsibilities with [Sparxent] in effect immediately prior to such reduction, (ii) any reduction by [Sparxent] in the Base Salary as set forth in Section 5(a) hereof, (iii) the breach of a material term of this Agreement by [Sparxent], (iv) the relocation of [Mr. Taylor's] primary place of employment to a location more than 30 miles from its current location, or (v) the failure of [Sparxent] to obtain the assumption of this Agreement by any successor contemplated in Section 11 below."

      11.    Pursuant to the terms of the Employment Agreement, Mr. Taylor's annual "Base Salary" was set at $200,000.00 *Id.* § 5(a).

      12.    Under the Employment Agreement, Mr. Taylor was also eligible for an annual performance bonus of $200,000.00. *See id.* § 5(b).

      13.    On or about October 19, 2009, Steven DeWindt ("DeWindt"), former CEO of Sparxent, informed Mr. Taylor that his employment at Sparxent was being terminated. DeWindt informed Mr. Taylor that this decision was made by Ed Ekstrom, a board member and significant investor in Sparxent. DeWindt, however, did not provide any reason for this decision.

14.     Although DeWindt informed Mr. Taylor that his employment was being terminated, no effective date for this decision was officially communicated to Mr. Taylor. Rather, Mr. Taylor was told that his Sparxent email account would be discontinued on October 23, 2009, and that he should destroy his corporate American Express card. In addition, Mr. Taylor was informed that Ashley Leonard would become the President/COO of Sparxent and that he, not Mr. Taylor, would be the primary contact with companies in Sparxent's acquisition queue.

15.     Sparxent was less than forthcoming with information regarding Mr. Taylor's termination. Additionally, the Employment Agreement provides a very limited two-week window for Mr. Taylor to exercise his right to voluntarily resign for good cause. Thus, on or about October 29, 2009, Mr. Taylor sent Sparxent a letter stating that it was his understanding that he had been terminated without cause. *See* Letter from M. Durham to A. Hyde, dated Oct. 29, 2009, attached hereto as Exhibit B. Mr. Taylor further stated that to the extent Sparxent had not officially terminated his employment he voluntarily resigned for good reason because there had been a material diminution in his duties and responsibilities at Sparxent. *See id.*

16.     In response, Ed Ekstrom called Mr. Taylor and acknowledged receipt of the October 29, 2009 letter. At no time, however, did Ed Ekstrom or Sparxent communicate any disagreement with Mr. Taylor's understanding as set forth in that letter.

17.     Mr. Taylor did not commit any acts of dishonesty in connection with his responsibilities as a Sparxent employee.

18.     Mr. Taylor has not been convicted of or pled guilty to a felony.

19.     Mr. Taylor did not commit any gross misconduct in connection with his employment at Sparxent.

20.     Mr. Taylor never received any written demand for performance from Sparxent indicating that he was not substantially performing his duties.  Indeed, Mr. Taylor was never told that his job performance at Sparxent was deficient or that he did not meet the company's expectations.

21.     Finally, Mr. Taylor has not violated the covenant not to compete set forth in Section 10 of the Employment Agreement.

22.     Mr. Taylor's employment was terminated without "Cause" and/or Mr. Taylor voluntarily resigned for "Good Reason" and Mr. Taylor is therefore entitled to the severance benefits set forth in the Employment Agreement including: $200,000.00 for twelve months of his base salary; $166,666.00 for his 2009 pro-rated annual performance bonus; $7,692.00 of unused 2009 vacation time; $49,488.00 for unpaid and undisputed accrued bonus from 2008; and $1200.73 of unpaid back salary from 2009, for a total of $425,046.73.

23.     On or about March 10, 2010, Mr. Taylor sent Sparxent a letter demanding a lump-sum payment of Mr. Taylor's benefits pursuant to the terms of the Employment Agreement. *See* Letter from M. Durham to A. Hyde, dated March 10, 2010, attached hereto as Exhibit C. Sparxent, however, has failed to pay Mr. Taylor his severance benefits.

24.     As a direct and proximate result of Sparxent's failure to respond to Mr. Taylor's request and/or pay his severance benefits, Mr. Taylor has suffered and will continue to suffer damages in an amount to be proven at trial, but in any event no less than $425,046.73.

### FIRST CAUSE OF ACTION
**Breach of Contract**

25.     Mr. Taylor reincorporates and re-alleges paragraphs 1 through 24 of the Complaint as though fully set forth herein.

26.     On or about August 31, 2007, Mr. Taylor and Sparxent entered into and executed the Employment Agreement.

27.     Pursuant to the Employment Agreement, Mr. Taylor is entitled to certain severance benefits if he is terminated without "Cause" or if he resigns for "Good Reason."

28.     On or about October 19, 2009, Mr. Taylor was terminated without "Cause."

29.     Alternatively, on or about October 29, 2009, Mr. Taylor resigned for "Good Reason" because there had been a material diminution in his duties and responsibilities at Sparxent.

30.     Mr. Taylor has fully performed his obligations under the Employment Agreement.

31.     Sparxent, however, has breached the Employment Agreement by, among other things, failing to provide Mr. Taylor with his severance benefits as set forth in the Employment Agreement.

32.     As a direct and proximate result of the foregoing, Mr. Taylor has suffered and will continue to suffer damages in an amount to be proven at trial, but in any event no less than $425,046.73.

## SECOND CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing

33.    Mr. Taylor reincorporates and re-alleges paragraphs 1 through 32 of the Complaint as though fully set forth herein.

34.    As set forth above, Mr. Taylor and Sparxent entered into and executed the Employment Agreement.  Under Utah law, the Employment Agreement between Mr. Taylor and Sparxent contains an implied covenant that the terms shall be performed in good faith and in a spirit of fair dealing.

35.    Sparxent has breached this covenant by the actions described above by depriving Mr. Taylor of the severance benefits to which he is entitled under the Employment Agreement.

36.    As a direct and proximate result of Sparxent's breach of the implied covenant of good faith and fair dealing, Mr. Taylor has suffered general and consequential damages in an amount to be proven at trial, but in any event no less than $425,046.73.

### PRAYER FOR RELIEF

**WHEREFORE**, Mr. Taylor prays for judgment and relief against Sparxent as follows:

On all Causes of Action

1.    For general compensatory and consequential damages in an amount to be determined at trial, but in any event no less than $425,046.73, together with interest thereon;

2.    For all costs and expenses, including attorneys' fees, incurred by Mr. Taylor in pursuing his remedies against Sparxent;

3.    For pre- and post-judgment interest as established by Utah law; and

4.      For such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Mr. Taylor hereby demands a trial by jury on all issues in this action triable of right

by a jury.

DATED:  September 16, 2010.

STOEL RIVES LLP

Matthew M. Durham
Cameron L. Ward

Attorneys for Plaintiff

Plaintiff's Address:

David R. Taylor
531 S. Arnold Court
Alpine, UT 84004

## VARCITY, INC.

## EMPLOYMENT AGREEMENT

*THIS EMPLOYMENT AGREEMENT* (this *"Agreement"*) is entered into as of August 31, 2007 between VARCity, Inc., a Delaware corporation (the *"Company"*), and David R. Taylor (*"Executive"*).

### RECITALS

A.    Executive is the President, Chief Executive Officer and Chief Financial Officer of the Company. The Board of Directors of the Company (the *"Board"*) believes that this Agreement will preserve and protect the assets of the Company, including the Company's goodwill and customers towards whom the Executive has, or will have, in his role as an employee of the Company, significant responsibilities. In consideration of the benefits provided to Executive under this Agreement, the Executive has agreed to enter into this Agreement.

B.    The Company and the Executive wish to enter into an employment relationship on the terms and conditions contained in this Agreement. This Agreement shall supersede any and all previous agreements between the Company and the Executive except as provided for in this Agreement.

### AGREEMENT

In consideration of the mutual covenants herein contained and the continued employment of Executive by Company, the parties agree as follows:

1.    <u>Definition of Terms</u>. The following terms referred to in this Agreement shall have the following meanings:

(a)    <u>Cause</u>.    "**Cause**" is defined as (i) an act of dishonesty by Executive in connection with Executive's responsibilities as an employee, (ii) Executive's conviction of, or plea of *nolo contendere* to, a felony, (iii) Executive's gross misconduct, (iv) Executive's continued substantial nonperformance of Executive's employment duties hereunder fifteen (15) days after Executive has received a written demand for performance from the Company which describes the basis for the Company's belief that Executive has not substantially performed Executive's duties, or (v) Executive's breaching, in any material respect, the terms of this Agreement or any confidentiality or proprietary information agreement with the Company.

(b)    <u>Change of Control</u>.    "**Change of Control**" shall mean (i) the sale, lease, conveyance or other disposition of all or substantially all of the Company's assets as an entirety or substantially as an entirety to any "person" (as such term is used in Section 13(d) of the Securities Exchange Act of 1934, as amended), entity or group of persons acting in concert; (ii) any "person" becoming the "beneficial owner" (as defined in Rule 13d-3 under said Act), directly or indirectly, of securities of the Company representing 50% or more of the total voting power represented by the

943073_1

Company's then-outstanding voting securities; (iii) a merger or consolidation of the Company with any other corporation, other than a merger or consolidation that would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its controlling entity) at least 50% of the total voting power represented by the voting securities of the Company or such surviving entity (or its controlling entity) outstanding immediately after such merger or consolidation; or (iv) a change in the composition of the Board occurring within a two (2)-year period, such that a majority of the then-current Board members ceases to be comprised of individuals who either (A) have been Board members continuously since the beginning of such period, or (B) have been elected or nominated for election as Board members during such period by at least a majority of the Board members described in clause (A) who were still in office at the time such election or nomination was approved by the Board.

(c)     Disability.   "**Disability**" shall mean Executive's inability to substantially perform Executive's essential job functions as the result of a physical or mental disability as determined by a qualified physician or incapacity for a period of 180 days, consecutive or otherwise, in any 360-day period.

(d)     Good Reason.   "**Good Reason**" shall mean the voluntary termination of employment by Executive within two (2) weeks of the occurrence of any of the following events, without Executive's express written consent: (i) any material diminution in Executive's duties or responsibilities with the Company in effect immediately prior to such reduction, (ii) any reduction by the Company in the Base Salary as set forth in Section 5(a) hereof, (iii) the breach of a material term of this Agreement by the Company, (iv) the relocation of Executive's primary place of employment to a location more than 30 miles from its current location, or (v) the failure of the Company to obtain the assumption of this Agreement by any successors contemplated in Section 11 below.

(e)     Termination Date.   "**Termination Date**" shall mean the effective date of any notice of termination delivered by one party to the other hereunder.

2.    Duties and Scope of Employment.

(a)     Positions and Duties.   Executive will continue to serve as the Company's President, Chief Executive Officer and Chief Financial Officer. Executive will render such business and professional services in the performance of his duties, consistent with Executive's position within the Company, as shall reasonably be assigned to him by the Board.

(b)     Obligations.   Executive will perform his duties faithfully and to the best of his ability and will devote his full business efforts and time to the Company. For the duration of this Agreement, Executive agrees not to actively engage in any other employment, occupation or consulting activity for any direct or indirect remuneration without the prior written approval of the Board. Notwithstanding the foregoing, nothing in this Agreement will prevent Executive from accepting speaking or presentation engagements in exchange for honoraria or from serving on boards of charitable organizations, or from owning no more than one percent (1%) of the outstanding equity securities of a corporation whose stock is listed on a national stock exchange.

943073_1

-2-

3. <u>At-Will Employment</u>.   Company and Executive acknowledge that Executive's employment is and shall continue to be at-will, as defined under applicable law. If Executive's employment terminates for any reason, Executive shall not be entitled to any payments, benefits, damages, awards or compensation other than (a) as provided by this Agreement or (b) as may otherwise be established under the Company's then existing employee benefit plans or policies at the time of termination.

4. <u>Confidential Information, Invention Assignment, Non-competition and Arbitration Agreement</u>.   Executive has completed and signed an Confidential Information, Invention Assignment, Non-competition and Arbitration Agreement (the **"IP Agreement"**) which shall continue to be in full force and effect. The signed IP Agreement is attached hereto as <u>Exhibit A</u>.

5. <u>Compensation</u>.

(a)   <u>Base Salary</u>.   The Company will accrue for Executive as compensation for his services a Base Salary at an annualized rate of $200,000 (the **"Base Salary"**). The Company will review Executive's Base Salary as appropriate and in no case less often than annually.

(b)   <u>Bonus</u>.   For Company's 2007 and 2008 fiscal year, Executive will be eligible for an annual performance bonus of $200,000, 60% of which shall be payable in equal quarterly installments based upon achievement of specific quarterly performance metrics determined by the Board, and 40% of which shall be payable annually based upon the achievement of specific annual performance metrics determined by the Board, provided, in each case, that Executive is employed by the Company on those dates, and provided further, that the annual performance bonus for fiscal year 2007 will be prorated to reflect to duration of Executive's employment during such fiscal year. For subsequent Company fiscal years, Executive's target bonus amount and other terms and conditions of Executive's bonus will be established by the Board.

6. <u>Employee Benefits</u>.   Executive will be entitled to participate in the employee benefit plans currently and hereafter maintained by the Company of general applicability to other employees and executives of the Company. The Company reserves the right to cancel or change the benefit plans and programs the Company offers to its employees at any time.

7. <u>Vacation</u>.   Executive will be entitled to three (3) weeks paid vacation per year in accordance with Company's vacation policy, with the timing and duration of specific vacations mutually and reasonably agreed to by the parties hereto.

8. <u>Expenses</u>.   Company will reimburse Executive for reasonable travel, entertainment or other expenses incurred by Executive in the furtherance of or in connection with the performance of Executive's duties hereunder, in accordance with the Company expense reimbursement policy as in effect from time to time.

9. <u>Severance Benefits</u>.

(a)   <u>Termination Following a Change of Control</u>.   If Executive's employment with the Company terminates other than for Cause, death, or Disability at any time within three (3)

943073_1

-3-

months before or six (6) months after a Change of Control, then, subject to Executive executing and not revoking a standard form of release of claims with the Company and complying with Section 10 of this Agreement, Executive shall be entitled to the following severance benefits:

   (i) One (1) year of Executive's Base Salary as in effect as of the date of such termination, less applicable withholding, payable in a lump sum within thirty (30) days of the Termination Date;

   (ii) One (1) times Executive's prorated annual bonus as of the date of termination payable in a lump sum within thirty (30) days of the Termination Date;

   (iii) the same level of health (*i.e.*, medical, vision and dental) coverage and benefits as in effect for Executive, and, if applicable, Executive's dependents, on the day immediately preceding the Termination Date; *provided, however, that* (A) Executive constitutes a qualified beneficiary, as defined in Section 4980B(g)(1) of the Internal Revenue Code of 1986 (the "**Code**"), as amended; and (B) Executive elects continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 as amended ("**COBRA**"), within the time period prescribed pursuant to COBRA. The Company shall reimburse Executive's COBRA premiums until the earlier of (x) the date Executive is no longer eligible to receive continuation coverage pursuant to COBRA, (y) six (6) months from the Termination Date or (z) until Executive obtains substantially similar coverage under another employer's group insurance plan.

  (b) Termination Apart from a Change of Control. If the Company terminates Executive's employment other than for Cause or if Executive terminates his employment for Good Reason then, subject to Executive executing and not revoking a standard form of release of claims with the Company and complying with Section 10 of this Agreement, Executive shall be entitled to the following severance benefits:

   (i) Twelve (12) months of Executive's Base Salary as in effect as of the date of such termination, less applicable withholding, payable in a lump sum within thirty (30) days of the Termination Date;

   (ii) One (1) times Executive's prorated annual bonus as of the date of termination payable in a lump sum within thirty (30) days of the Termination Date;

   (iii) the same level of health (*i.e.*, medical, vision and dental) coverage and benefits as in effect for Executive, and, if applicable, Executive's dependents, on the day immediately preceding the Termination Date; *provided, however,* that (A) Executive constitutes a qualified beneficiary, as defined in Section 4980B(g)(1) of the Code; and (B) Executive elects continuation coverage pursuant to COBRA within the time period prescribed pursuant to COBRA. The Company shall reimburse Executive's COBRA premiums until the earlier of (x) the date Executive is no longer eligible to receive continuation coverage pursuant to COBRA, (y) six (6) months from the Termination Date or (z) until Executive obtains substantially similar coverage under another employer's group insurance plan.


943073_1

-4-

(c)   Termination for Cause or Voluntary Resignation. If the Company terminates Executive's employment for Cause or if Executive resigns other than for Good Reason, Executive shall be entitled to only those benefits provided under Section 9(d) below.

(d)   Accrued Wages and Vacation; Expenses. Without regard to the reason for, or the timing of, Executive's termination of employment: (i) Company shall pay Executive any unpaid Base Salary due for periods prior to the Termination Date, (ii) Company shall pay Executive all of Executive's accrued and unused vacation through the Termination Date, and (iii) following submission of proper expense reports by Executive, Company shall reimburse Executive for all expenses reasonably and necessarily incurred by Executive in connection with the business of Company prior to the Termination Date. These payments shall be made promptly upon termination and within the period of time mandated by law.

10.   Covenant Not to Compete or Solicit.

(a)   Beginning on the Termination Date and ending on the one (1) year anniversary following the Termination Date (the "*Non-Compete Period*"), Executive shall not, other than on behalf of the Company, directly or indirectly, without the prior written consent of Company, engage anywhere in the Geographic Area (as defined below) in (whether as an employee, agent, consultant, advisor, independent contractor, proprietor, partner, officer, director or otherwise), have any ownership interest in (except for passive ownership of one percent (1%) or less of any entity whose securities have been registered under the Securities Act of 1933 or Section 12 of the Securities Exchange Act of 1934), or participate in the financing, operation, management or control of, any firm, partnership, corporation, entity or business that is engaged or participates in, or intends to engage or participate in, any activity or business which is competitive with or of the same nature as, or substantively similar to, an activity or business of the Company or an activity or business in which the Company is engaged (the "*Restricted Business*").

(b)   During the Non-Compete Period, Executive shall not, directly or indirectly, without the prior written consent of the Company, solicit, encourage or take any other action which is intended to induce or encourage, or has the effect of inducing or encouraging, any employee of the Company or any subsidiary of the Company, to terminate his or her employment with the Company or any such subsidiary of the Company.

(c)   During the Non-Compete Period, Executive shall not, directly or indirectly, without the prior written consent of the Company, induce or attempt to induce any of the Company's or the Company's respective customers, suppliers, distributors or contractors to terminate, reduce or otherwise change its relationship with the Company in order to enter into any relationship with Executive or with any other person that engages or participates (or plans to engage or participate) in a Restricted Business.

(d)   The term "*Geographic Area*" shall mean any location in the world where the Company has offices, employees or customers.

943073_1

-5-

(e)     The covenants contained in the preceding paragraphs shall be construed as a series of separate covenants, one for each county, city, state, or any similar subdivision in any Geographic Area. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in the preceding paragraphs. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event that the provisions of this Section 10 are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, permitted by applicable laws.

(f)     Executive acknowledges and agrees that the nature of the businesses of the Company are such that if Executive were to become employed by, or substantially involved in, the business of a competitor of the Company soon after the termination of Executive's employment with the Company, as the case may be, it would be very difficult for Executive not to rely on or use the Company's trade secrets and confidential information. Executive has agreed to enter into this Agreement to, among other things, avoid the likely disclosure of the Company's trade secrets and confidential information.

(g)     Executive also acknowledges and agrees that the limitations of time, geography, and scope of activity agreed to in this Agreement are reasonable because, among other things, (i) the Company in engaged in highly competitive industries, (ii) Executive will have access to the trade secrets, proprietary and confidential information of the Company, and (iii) in the event Executive's employment with the Company, as the case may be, ended, Executive would be able to obtain suitable and satisfactory employment without violation of this Agreement.

(h)     Executive acknowledges and agrees that it would be impossible or inadequate to measure and calculate the Company's damages from any breach of the covenants set forth in this Section 10. Accordingly, Executive agrees that in the event that Executive breaches any provision of this Section 10, the Company shall be entitled, in addition to any other right or remedy otherwise available, to the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific performance of any such provision of this Agreement. Executive further agrees that no bond or other security shall be required in obtaining such equitable relief, nor will proof of actual damages be required for such equitable relief. Executive hereby expressly consents to the issuance of such injunction and to the ordering of such specific performance.

## 11. Successors.

(a)     Company's Successors. Any successor to the Company (whether direct or indirect and whether by purchase, lease, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business or assets shall assume the Company's obligations under this Agreement and agree expressly in writing to perform the Company's obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term

943073_1

-6-

"Company" shall include any successor to the Company's business or assets which executes and delivers the assumption agreement described in this subsection (a) or which becomes bound by the terms of this Agreement by operation of law.

(b)  Executive's Successors.   Without the written consent of the Company, Executive shall not assign or transfer this Agreement or any right or obligation under this Agreement to any other person or entity. Notwithstanding the foregoing, the terms of this Agreement and all rights of Executive hereunder shall inure to the benefit of, and be enforceable by, Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

12. Notices.

(a)  General.  Notices and all other communications contemplated by this Agreement shall be in writing and shall be deemed to have been duly given when personally delivered or when mailed by U.S. registered or certified mail, return receipt requested and postage prepaid. In the case of Executive, mailed notices shall be addressed to Executive at the home address which Executive most recently communicated to the Company in writing. In the case of the Company, mailed notices shall be addressed to its corporate headquarters, and all notices shall be directed to the attention of its Secretary. Notices may also be delivered by facsimile or electronic mail if evidence of receipt is given by the recipient and shall be effective when so received.

(b)  Notice of Termination.  Any termination by the Company for Cause or by Executive as a result of a voluntary resignation or an Involuntary Termination shall be communicated by a notice of termination to the other party hereto given in accordance with this Section 12. Such notice shall indicate the specific termination provision in this Agreement relied upon, shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination under the provision so indicated, and shall specify the Termination Date (which shall be not more than 30 days after the giving of such notice). The failure by Executive to include in the notice any fact or circumstance which contributes to a showing of Good Reason shall not waive any right of Executive hereunder or preclude Executive from asserting such fact or circumstance in enforcing his rights hereunder.

13  Limitation on Payments.  In the event that the severance and other benefits provided for in this Agreement or otherwise payable to Executive (i) constitute "parachute payments" within the meaning of Section 280G of the Code, and (ii) would be subject to the excise tax imposed by Section 4999 of the Code (the "Excise Tax"), then Executive's benefits under this Agreement shall be either

(a)  delivered in full, or

(b)  delivered as to such lesser extent which would result in no portion of such benefits being subject to the Excise Tax, whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the Excise Tax, results in the receipt by


943073_1

-7-

Executive on an after-tax basis, of the greatest amount of benefits, notwithstanding that all or some portion of such benefits may be taxable under Section 4999 of the Code.

Unless the Company and Executive otherwise agree in writing, any determination required under this Section 13 shall be made in writing by the Company's independent public accountants (the "**Accountants**"), whose determination shall be conclusive and binding upon Executive and the Company for all purposes. For purposes of making the calculations required by this Section 13, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Section 280G and 4999 of the Code. The Company and Executive shall furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Section 13. The Company shall bear all costs the Accountants may reasonably incur in connection with any calculations contemplated by this Section 13.

Notwithstanding anything to the contrary in this Agreement, any severance payments to be made to the Executive under this Agreement will not be paid during the six-month period following Executive's termination of employment unless the Company determines, in its good faith judgment, that paying such amounts at the time or times indicated above would not cause Executive to incur an additional tax under Section 409A of the Code (in which case such amounts shall be paid at the time or times indicated above). If the payment of any amounts are delayed as a result of the previous sentence, on the first day following the end of the six-month period, the Company will pay Executive a lump-sum amount equal to the cumulative amounts that would have otherwise been previously paid to Executive under this Agreement. If the Company or Executive believe at any time that any benefits that Executive is entitled to under this agreement do not comply with or are not exempt from Section 409A of the Code, such party will advise the other and both parties will negotiate reasonably and in good faith to amend the terms of this Agreement so that it either complies with or is exempt from Section 409A of the Code.

14. Arbitration.

(a)     Any dispute or controversy arising out of, relating to, or in connection with this Agreement or the interpretation, validity, construction, performance, breach, or termination thereof, shall be settled by binding arbitration to be held in Salt Lake City, Utah, in accordance with the National Rules for the Resolution of Employment Disputes then in effect of the American Arbitration Association (the "**Rules**"). The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction.

(b)     The arbitrator(s) shall apply Utah law to the merits of any dispute or claim, without reference to conflicts of law rules. The arbitration proceedings shall be governed by federal arbitration law and by the Rules, without reference to state arbitration law. Executive hereby consents to the personal jurisdiction of the state and federal courts located in Utah for any action or proceeding arising from or relating to this Agreement or relating to any arbitration in which the parties are participants.

943073_1

-8-

(c)     Executive understands that nothing in this Section modifies Executive's at-will employment status.   Either Executive or the Company can terminate the employment relationship at any time, with or without Cause.

(d)     EXECUTIVE HAS READ AND UNDERSTANDS THIS SECTION, WHICH DISCUSSES ARBITRATION. EXECUTIVE UNDERSTANDS THAT SUBMITTING ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, OR THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION THEREOF TO BINDING ARBITRATION CONSTITUTES A WAIVER OF EXECUTIVE'S RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE EMPLOYER/EMPLOYEE RELATIONSHIP, INCLUDING BUT NOT LIMITED TO, THE FOLLOWING CLAIMS:

(i)     ANY AND ALL CLAIMS FOR WRONGFUL DISCHARGE OF EMPLOYMENT; BREACH OF CONTRACT, BOTH EXPRESS AND IMPLIED; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, BOTH EXPRESS AND IMPLIED; NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; NEGLIGENT OR INTENTIONAL MISREPRESENTATION; NEGLIGENT OR INTENTIONAL INTERFERENCE WITH CONTRACT OR PROSPECTIVE ECONOMIC ADVANTAGE; AND DEFAMATION.

(ii)     ANY AND ALL CLAIMS FOR VIOLATION OF ANY FEDERAL, STATE OR MUNICIPAL STATUTE OF ANY JURISDICTION, INCLUDING, BUT NOT LIMITED TO, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE CIVIL RIGHTS ACT OF 1991, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE FAIR LABOR STANDARDS ACT, THE FAIR CREDIT REPORTING ACT, EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, THE FAMILY AND MEDICAL LEAVE ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT AND THE OLDER WORKERS BENEFIT PROTECTION ACT.

(iii)     ANY AND ALL CLAIMS ARISING OUT OF ANY OTHER LAWS AND REGULATIONS RELATING TO EMPLOYMENT OR EMPLOYMENT DISCRIMINATION.

15. Miscellaneous Provisions.

(a)     No Duty to Mitigate.  Executive shall not be required to mitigate the amount of any payment contemplated by this Agreement, nor shall any such payment be reduced by any earnings that Executive may receive from any other source.

(b)     Waiver.  No provision of this Agreement may be modified, waived or discharged unless the modification, waiver or discharge is agreed to in writing and signed by Executive and by an authorized officer of the Company (other than Executive). No waiver by either party of any breach of, or of compliance with, any condition or provision of this Agreement by the

943073_1

-9-

other party shall be considered a waiver of any other condition or provision or of the same condition or provision at another time.

(c)      Integration.   This Agreement and any outstanding stock option agreements and restricted stock purchase agreements represent the entire agreement and understanding between the parties as to the subject matter herein and supersede all prior or contemporaneous agreements, whether written or oral, with respect to this Agreement and any stock option agreement or restricted stock purchase agreement.

(d)      Choice of Law.   The validity, interpretation, construction and performance of this Agreement shall be governed by the internal substantive laws, but not the conflicts of law rules, of the State of Utah.

(e)      Severability.   The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision hereof, which shall remain in full force and effect.

(f)      Employment Taxes.   All payments made pursuant to this Agreement shall be subject to withholding of applicable income and employment taxes.

(g)      Counterparts.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

*[Signature page follows]*

943073_1

-10-

2007-08-31 09:03        The DeWindts   1-949-486-3731>>    18015327543                                    P 9/16

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by its duly authorized officer, as of the day and year first above written.

**COMPANY:**                                **VARCITY, INC.**

<br>

_____

D. Stephen DeWindt
President and Chief Executive Officer

**EXECUTIVE:**

_____

David R. Taylor

*[SIGNATURE PAGE TO EMPLOYMENT AGREEMENT]*

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by its duly authorized officer, as of the day and year first above written.

COMPANY:                          VARCITY, INC.


_____
D. Stephen DeWindt
President and Chief Executive Officer

EXECUTIVE:
_____
David R. Taylor


[SIGNATURE PAGE TO EMPLOYMENT AGREEMENT]



**STOEL RIVES** LLP
ATTORNEYS AT LAW

201 S. Main Street, Suite 1100
Salt Lake City, Utah 84111
main 801.328.3131
fax 801.578.6999
www.stoel.com

MATTHEW M. DURHAM
*Direct (801) 578-6984*
mmdurham@stoel.com

October 29, 2009

**BY FIRST CLASS MAIL AND EMAIL**

Andrew Hyde
Chief Financial Officer
Sparxent, Inc.
2795 E. Cottonwood Parkway
Suite 360
Salt Lake City, Utah 84121

Re:    **David R. Taylor**

Dear Mr. Ekstrom:

This firm represents David R. Taylor, formerly the Chief Marketing Officer at Sparxent, Inc. ("Sparxent").

As you know, Mr. Taylor is party to a contract of employment (the "Employment Contract") with Sparxent, a copy of which is attached. Under the Employment Contract, Mr. Taylor is entitled to certain severance benefits if his employment is terminated "Without Cause," or if he terminates his employment for "Good Reason." *See* Employment Contract ¶ 1, ¶ 9. The Employment Contract provides that, under such circumstances, Mr. Taylor is entitled to twelve months of his base salary, his prorated bonus to the date of termination and continuation of health insurance benefits at Sparxent's expense. In addition to these severance benefits, Mr. Taylor is also entitled to his accrued salary, unused sick and vacation pay, and any unpaid or deferred compensation or bonuses that he has not been paid. Finally, he is entitled to any other retirement or stock benefits or compensation which he has earned or for which he is eligible under relevant plans or programs at Sparxent.

As you also know, Mr. Taylor was informed on October 19, 2009 that his employment at Sparxent was being terminated. This message was communicated to Mr. Taylor by Steve DeWindt, formerly the CEO of Sparxent, who said this decision was made by Ed Ekstrom. Mr. DeWindt did not provide Mr. Taylor with any reason for this decision; indeed, Mr. Taylor has never been told that his job performance at Sparxent was deficient or that he was not meeting the company's expectations. Under these circumstances, Mr. Taylor can only conclude that his employment with Sparxent has been terminated without cause.

Oregon   Washington
California   Utah   Idaho   Colorado   Minnesota



Andrew Hyde
October 29, 2009
Page 2

The company has been less than forthcoming with information regarding the termination of Mr. Taylor's employment. For example, while it was clearly stated to him that his employment at Sparxent was ending, no effective date for this decision was officially communicated to him. Mr. Taylor was told, however, that his Sparxent email account would be discontinued on October 23rd and that he should destroy his corporate American Express card. In addition he was told that Ashley Leonard would become the President/COO of Sparxent and that she, not Mr. Taylor, would be the primary contact with companies in Sparxent's acquisitions queue.

Sparxent's lack of communication has led to confusion and concern on Mr. Taylor's part. Among other things, Mr. Taylor is concerned that, despite his clear understanding that his employment has been terminated without cause, Sparxent may claim some other understanding. This lack of clarity places Mr. Taylor in an uncomfortable position, since the Employment Contract gives him a very limited amount time in which to exercise his right to voluntarily resign for good cause and protect his rights under the agreement. Consequently, if Sparxent now takes the position that Mr. Taylor's employment has not been terminated, then Mr. Taylor hereby voluntarily resigns for good cause, effective immediately, because there has been a material diminution in his duties and responsibilities at Sparxent.

I look forward to discussing with you Sparxent's payment of Mr. Taylor's severance benefit. Please contact me at the number listed above.

Very truly yours,

Matthew M. Durham

MMD:sh
Enclosure
cc:    David Taylor



STOEL
RIVES
LLP
ATTORNEYS AT LAW

201 S. Main Street, Suite 1100
Salt Lake City, Utah 84111
main 801.328.3131
fax 801.578.6999
www.stoel.com

MATTHEW M. DURHAM
*Direct (801) 578-6984*
mmdurham@stoel.com

March 10, 2010

**BY FIRST CLASS MAIL AND EMAIL**

Andrew Hyde
Chief Financial Officer
Sparxent, Inc.
2795 E. Cottonwood Parkway
Suite 360
Salt Lake City, Utah 84121

**Re:   David R. Taylor**

Dear Mr. Hyde:

In my letter dated October 29, 2009, I indicated David Taylor understands that he was terminated without cause by Sparxent, Inc. ("Sparxent") and requested further discussion with Sparxent about payment of Mr. Taylor's severance benefits. Ed Ekstrom has since called Mr. Taylor and acknowledged receipt of the letter dated October 29, 2009, but at no time has Sparxent communicated its disagreement with Mr. Taylor's understanding as set forth in that letter. Mr. Taylor therefore assumes that he was in fact terminated without cause by Sparxent.

Mr. Taylor is therefore entitled to the severance benefits provided in his employment agreement with Sparxent. Under the employment agreement, Mr. Taylor is entitled to $38,461 for accrued and unpaid salary prior to termination of his employment, $49,488 for accrued and unpaid bonus from 2008, $7,692 for accrued and unpaid vacation, $200,000 for twelve months of his base salary, and $166,666 for his pro-rated 2009 bonus, totaling of $462,307. (*See* Employment Agreement Sections 9(b), 9(d).)

As you know, Mr. Taylor has continued to receive some payments from Sparxent equivalent to his previous salary. To date he has received payment from Sparxent in the amount of $37,260.27 since termination of his employment in October. While Mr. Taylor is willing to accept these amounts as payment toward the severance benefits Sparxent owes him, reducing the amount to $425,046.73, his acceptance in no way waives any right to the severance benefits to which Mr. Taylor is entitled under his employment contract with Sparxent.

Oregon   Washington
California   Utah   Idaho   Colorado   Minnesota



Andrew Hyde
March 10, 2010
Page 2

Although we recognize that Sparxent is facing present challenges, ultimately Sparxent must fulfill its contractual obligations to Mr. Taylor and pay the remaining $425,046.73 to which Mr. Taylor is entitled. In fact, the Employment Agreement contemplates a lump-sum payment of severance benefits, which Mr. Taylor hereby demands. Sparxent's failure to timely make this payment will require Mr. Taylor to exercise his legal rights and seek recovery for damages, costs and interest.

Please feel free to contact me at the number listed above to discuss.

Very truly yours,

Matthew M. Durham

cc: David R. Taylor

# MINUTES OF A MEETING

# OF THE BOARD OF DIRECTORS OF

# VARCITY, INC.

### June 27, 2008

Pursuant to notice duly given, a telephonic meeting of the Board of Directors (the **"Board"**) of VARCity, Inc., a Delaware corporation (the **"Company"**), was held on June 27, 2008 commencing at approximately 1:45 p.m. Mountain Time. Participating were directors Steve DeWindt, David Taylor and Ed Ekstrom. Also present was Matt Wells of Ray Quinney & Nebeker P.C., counsel to the Company (**"RQN"**). Mr. DeWindt called the meeting to order and as all directors were present at the commencement of the meeting Mr. DeWindt declared that a quorum was present. Mr. Wells acted as secretary of the meeting.

Mr. DeWindt reported on matters relating to the proposed Series A-1 and A-2 Preferred Stock financing pursuant to the resolutions and agreements previously circulated to the Board. Upon motion duly made and seconded, the Board approved the following resolutions:

### REFINANCING OF INDEBTEDNESS; AUTHORIZATION OF FINANCING

**WHEREAS,** the Board of Directors (the **"Board"**) of VARCity, Inc. (the **"Company"**) previously authorized the Company to issue to vSpring III, L.P. (the **"Lender"**) convertible promissory notes styled Note No. 2008-1 issued to Lender on January 11, 2008 in a principal amount of $2,500,000 and Note No. 2008-2 issued to Lender on February 29, 2008 in a principal amount of $250,000 (collectively, the **"Prior Notes"**).

**WHEREAS,** Lender has made an additional advance to the Company on May 7, 2008 in an amount of $250,000 (the **"Prior Indebtedness"**).

**WHEREAS,** inasmuch as the Prior Notes have matured and in order to consolidate and document the terms of the Prior Indebtedness, the Board deems it advisable, and in the best interests of the Company and its stockholders, to issue to Lender a new convertible promissory note in the

principal amount of $3,000,000 in substantially the form attached hereto as **Exhibit A** (the **"Convertible Note"**).

**WHEREAS**, the Board deems it advisable, and in the best interests of the Company and its stockholders, to engage in an equity financing whereby it will issue shares of newly designated Series A-1 and Series A-2 Preferred Stock to various Investors, as defined below, in exchange for cash and conversion of indebtedness (the **"Financing"**).

**WHEREAS**, Section 144 of the Delaware General Corporation Law provides that certain contracts or transactions (any such contract or transaction, an **"Interested Party Transaction"**) between a corporation and any of its directors or another entity of which any of its directors is a director or in which any of its directors has a material financial interest (any such party, an **"Interested Party"**) are not void or voidable under certain circumstances (the **"Interested Party Transaction Safe Harbor"**).

**WHEREAS**, the availability of the Interested Party Transaction Safe Harbor for the Convertible Note and the Financing is conditioned on, among other things, (i) the material facts as to the director's relationship or interest and as to the transaction are disclosed or are known to the board of directors and (ii) the board in good faith authorizes the transaction by the affirmative votes of a majority of the disinterested directors.

**WHEREAS**, the Board acknowledges that (i) Ed Ekstrom, a director of the Company, is an affiliate of, and has a financial interest in, vSpring III, L.P., which is the Lender and will be the lead Investor in the Financing, (ii) David R. Taylor, a director of the Company, will participate as an Investor in the Financing, and (iii) the foregoing render each of the Convertible Note and the Financing an Interested Party Transaction.

**WHEREAS**, the Board has reviewed, evaluated and discussed with the officers of the Company (i) the material facts, terms and conditions of each Interested Party Transaction, (ii) the rights and obligations of the Company, the Board, the stockholders of the Company and other parties in connection therewith, (iii) the costs, obligations, requirements (financial or otherwise) and other factors and considerations required by each Interested Party Transaction, (iv) the Company's financing objectives and financial situation, and (v) the nature of the relationships and interests of each Interested Party with and in the Company in connection with each Interested Party Transaction.

**NOW, THEREFORE, BE IT RESOLVED:** That after due inquiry, the Board (with Mr. Ekstrom and Mr. Taylor abstaining as to the applicable Interested Party Transaction) believes that each Interested Party Transaction is appropriate for, in the best interests of, and advisable, just and reasonable to the Company and, in the exercise of its fiduciary duty, hereby approves each Interested Party Transaction and related matters as follows:

ISSUANCE OF CONVERTIBLE NOTE

**RESOLVED FURTHER:** That the Board hereby approves the form of the Convertible Note in substantially the form attached hereto as **Exhibit A**.

-2-

**RESOLVED FURTHER:** That the Board hereby authorizes and empowers the officers of the Company to execute and deliver the Convertible Note, along with such changes and modifications as they, in consultation with legal counsel, may consider necessary or appropriate, with such approval evidenced by their signatures thereon.

**RESOLVED FURTHER:** That the Board hereby authorizes and empowers the officers of the Company and the attorneys of Ray Quinney & Nebeker to execute and file any filings required under state or federal securities laws in connection with the issuance of the Convertible Note.

**RESOLVED FURTHER:** That the Board hereby approves and ratifies all actions taken by the officers of the Company in connection with the Convertible Note prior to this meeting as valid and authorized actions of the Company.

### AUTHORIZATION OF AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

**RESOLVED FURTHER:** That the Company amend and restate its Certificate of Incorporation to (i) change the name of the Company to "Sparxent, Inc." (ii) increase the authorized number of shares of Common Stock to 15,000,000, (iii) create a new class of stock, designated "Preferred Stock" consisting of 5,455,000 authorized shares, (iv) create a new series of Preferred Stock, designated Series A-1 Preferred Stock, consisting of 4,805,000 authorized shares, (v) create a new series of Preferred Stock, designated Series A-2 Preferred Stock, consisting of 650,000 authorized shares, (vi) establish the rights, preferences, privileges and restrictions of the Preferred Stock, and (vii) make certain other changes.

**RESOLVED FURTHER:** That the Company's Amended and Restated Certificate of Incorporation, in the form attached hereto as **Exhibit B** (the "**Restated Certificate**"), is hereby approved, adopted and confirmed.

**RESOLVED FURTHER:** That the officers of the Company and any designee of such officers (the "**Authorized Officers**") be, and each of them hereby is, individually authorized to solicit the approval of the Company's stockholders of the Restated Certificate and, upon receipt of such approval, to execute in the name and on behalf of the Company the Restated Certificate and take all such action as such persons deem necessary or desirable to file the Restated Certificate with the Secretary of State of Delaware and to cause the Restated Certificate to become effective.

### AUTHORIZATION OF AMENDED AND RESTATED BYLAWS

**RESOLVED FURTHER:** That the Company amend and restate its Bylaws to (i) change the name of the Company to "Sparxent, Inc." and (ii) make certain other changes.

**RESOLVED FURTHER:** That the Company's Amended and Restated Bylaws, in the form attached hereto as **Exhibit C**, are hereby approved, adopted and confirmed.

**RESOLVED FURTHER:** That the Secretary or Assistant Secretary of the Company is hereby authorized and directed to execute a certificate of the amendment of the Bylaws and

-3-

insert such certificate and the Bylaws in the minute book of the Company, and that the officers of the Company are ordered to maintain a copy of such Bylaws in the principal office of the Company open for inspection by the stockholders at all reasonable times during office hours.

## SALE AND ISSUANCE OF SHARES

**RESOLVED FURTHER:** That the Company sell and issue up to 4,805,000 shares of Series A-1 Preferred Stock (the "**Shares**") at a purchase price of $3.60 per share to certain "accredited investors" (the "**Investors**"), as that term is defined in the Securities Act of 1933, as amended, pursuant to the Purchase Agreement (as defined below).

**RESOLVED FURTHER:** That the Board hereby approves the purchase price of $3.60 per Share and deems it to be good, fair and valuable consideration and reasonably equivalent value for each Share.

**RESOLVED FURTHER:** That the Company sell and issue up to 633,803 shares of Series A-2 Preferred Stock (the "**Shares**") at a purchase price of $4.26 per share to certain "accredited investors" pursuant to the Purchase Agreement.

**RESOLVED FURTHER:** That the Board hereby approves the purchase price of $4.26 per Share and deems it to be good, fair and valuable consideration and reasonably equivalent value for each Share.

**RESOLVED FURTHER:** That the Authorized Officers be, and each of them hereby is, individually authorized and empowered to execute and deliver, in the name and on behalf of the Company all documents relating to the Financing (the "**Financing Documents**") including, without limitation:

(i)    The Series A-1 and Series A-2 Preferred Stock Purchase Agreement (the "**Purchase Agreement**"), substantially in the form attached hereto as **Exhibit D**.

(ii)   The Investor Rights Agreement (the "**Investor Rights Agreement**"), substantially in the form attached hereto as **Exhibit E**.

(iii)  The Voting Agreement (the "**Voting Agreement**"), substantially in the form attached hereto as **Exhibit F**.

(iv)   The Right of First Refusal and Co-Sale Agreement (the "**ROFR Agreement**"), substantially in the form attached hereto as **Exhibit G**.

(v)    The Management Rights Letter (the "**Management Rights Letter**"), substantially in the form attached hereto as **Exhibit H**.

(vi)   Such other documents, certificates, instruments and agreements contemplated by the agreements listed above or deemed necessary by the Authorized Officers to consummate the transactions contemplated thereby and from time to time to amend or

-4-

modify any of the Financing Documents in such manner and form, as any Authorized Officer shall approve.

**RESOLVED FURTHER:** That all of the terms, provisions, and conditions included or to be included in the Financing Documents are hereby ratified and approved in all respects, with such changes as may be approved by any Authorized Officer, such approval to be conclusively evidenced by the execution and delivery of any of the foregoing by any such Authorized Officer.

**RESOLVED FURTHER:** That the Board hereby reserves: (i) 4,805,000 shares of Series A-1 Preferred Stock for issuance upon purchase pursuant to the Purchase Agreement; (ii) 650,000 shares of Series A-2 Preferred Stock for issuance upon purchase pursuant to the Purchase Agreement; and (iii) 5,455,000 shares of Common Stock (as may be adjusted in accordance with the provisions of the Restated Certificate) for issuance upon conversion of the Company's Preferred Stock.

**RESOLVED FURTHER:** That the Shares shall be validly issued, fully paid and nonassessable when issued in accordance with the terms of the Purchase Agreement.

**RESOLVED FURTHER:** That the shares of Common Stock (and any additional shares of capital stock as may be necessary to issue pursuant to the terms of the Series A-1 and Series A-2 Preferred Stock) issuable upon conversion of the Shares shall be validly issued, fully paid and nonassessable when issued in accordance with the terms of the Restated Certificate.

**RESOLVED FURTHER:** That the Authorized Officers are authorized and empowered to execute and deliver all documents and take whatever actions are deemed necessary or advisable to comply with all applicable state and federal securities laws.

**RESOLVED FURTHER:** That the Authorized Officers be, and each of them hereby is, authorized and empowered, for and in the name and on behalf of the Company, to execute and deliver, to the appropriate parties, the Financing Documents, substantially in the form submitted to and reviewed by the Board, with such changes therein or additions thereto as the officer executing the same shall approve with the advice of legal counsel, the execution and delivery of such agreements by such officer to be conclusive evidence of the approval of the Board thereof and all matters relating thereto.

**BLUE SKY MATTERS**

**RESOLVED FURTHER:** That the proper officers of the Company shall consult with legal counsel and shall take such actions as are necessary to secure an exemption from registration under the Securities Act of 1933 for the Preferred Stock and the securities issuable upon conversion of the Preferred Stock in each state in which such securities are offered and sold.

**RESOLVED FURTHER:** That the proper officers of the Company are authorized and empowered, if deemed by them appropriate to do so, upon advice of counsel, to file a notice on Form D with the Securities and Exchange Commission or any states, as appropriate, respecting the offering.

**RESOLVED FURTHER:** That the proper officers of the Company are hereby authorized, and empowered to execute, seal, attest, acknowledge, and deliver such documents, applications, and other instruments for the registration or other qualification of the Preferred Stock, or for the attainment of an exemption from such registration or qualification as they may deem necessary or advisable in order to permit the sale of such securities under the "blue sky" or other securities laws of any state in the United States and for this purpose, the proper officers of the Company are hereby authorized and empowered to execute, seal, attest, acknowledge, and deliver, in the name and on behalf of the Company, such consents to service of process, issuer's covenants, powers of attorney, and other documents, and each and every resolution required to be adopted by any legislation or law, or by any order or regulation of any governmental body or agency, in any state or jurisdiction wherein such securities may be registered, qualified, or offered for sale, shall be deemed to be and the same hereby is, adopted, approved, and confirmed, and that all action heretofore taken by the officers of the Company with respect to such registration, qualification, or exemption is ratified, approved, and confirmed.

### INDEMNIFICATION AGREEMENTS

**WHEREAS,** the Board has determined that it is in the best interests of the Company and its stockholders to enter into indemnification agreements in connection with the Financing.

**NOW, THEREFORE, BE IT RESOLVED:** That the Board hereby approves the execution of indemnification agreements to be entered into between the Company and certain of its directors and their affiliated fund in connection with the Financing, in substantially the form attached hereto as **Exhibit I** the "**Indemnification Agreement**").

**RESOLVED FURTHER:** That the Authorized Officers are hereby authorized to solicit and obtain the approval of the Company's stockholders with respect to the Indemnification Agreement.

### STOCK RESTRICTION AGREEMENTS

**WHEREAS,** it is a condition to the Closing of the Financing that the Company enter into Stock Restriction Agreements with its current stockholders.

**NOW, THEREFORE, BE IT RESOLVED:** That the Board deems it appropriate and in the best interests of the Company to enter into a Stock Restriction Agreement in substantially the form attached hereto as **Exhibit J** (each a "**Stock Restriction Agreement**"), with each of Steve DeWindt and David R. Taylor.

**RESOLVED FURTHER:** That the Authorized Officers be, and each of them hereby is, individually authorized and empowered to execute and deliver, in the name and on behalf of the Company each Stock Restriction Agreement, with such changes therein or additions thereto as the officer executing the same shall approve with the advice of legal counsel, the execution and delivery of such agreements by such officer to be conclusive evidence of the approval of the Board thereof and all matters relating thereto.

-6-

## AUTHORIZATION AND APPOINTMENT OF DIRECTORS

**WHEREAS**, the Board deems it advisable, and in the best interests of the Company and its stockholders, to increase the number of directors as required pursuant to the Voting Agreement, which is a condition to the closing of the Financing pursuant to the Purchase Agreement (the "*Closing*").

**NOW, THEREFORE, BE IT RESOLVED:** That, effective upon the Closing, the authorized number of directors within the limits specified in the Company's Bylaws shall be, and hereby is, increased to five (5).

**RESOLVED FURTHER:** That, effective upon the Closing, Jeron Paul is hereby appointed to serve as a member of the Board until the next annual meeting of stockholders of the Company and until his successor is duly elected and qualified or until his earlier death, resignation or removal.

**RESOLVED FURTHER:** That, effective upon the Closing, the Company's Board of Directors shall consist of the following individuals with each holding the position in accordance with the Voting Agreement indicated in parenthesis:

1) Steve DeWindt        (Common Designee)
2) David R. Taylor      (Common Designee)
3) Ed Ekstrom           (Series A Designee)
4) Jeron Paul           (Series A Designee)
5) (Vacant)             (Mutual Director)

## OMNIBUS RESOLUTIONS

**RESOLVED:** That, in order to fully carry out the intent and effectuate the purposes of the foregoing resolutions, the Authorized Officers be, and each of them hereby is, individually authorized in the name and on behalf of the Company from time to time (i) to prepare, execute, deliver and perform, as the case may be, such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertakings, (ii) to pay or cause to be paid on behalf of the Company any related costs and expenses and (iii) to take such other actions, in the name and on behalf of the Company, as each such Authorized Officer, in such person's discretion, shall deem necessary or advisable to complete and effect the foregoing transactions or to carry out the intent and purposes of the foregoing resolutions and the transactions contemplated thereby, the preparation, execution, delivery and performance of any such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertakings, the payment of any such costs or expenses and the performance of any such other acts shall be conclusive evidence of the approval of the Board thereof and all matters relating thereto.

**RESOLVED FURTHER:** That all actions heretofore taken by the officers and directors of the Company with respect to the foregoing transactions and all other matters contemplated by the foregoing resolutions are hereby approved, adopted, ratified and confirmed.

There being no further business, on a motion duly made and seconded, there being no objections, the meeting was adjourned at approximately 2:15 p.m. MDT.

Matt Wells, Secretary of the Meeting

-8-

# COVER SHEET FOR CIVIL FILING ACTIONS

Page 1 of 2

**Party Identification (Attach additional sheets as necessary)**

PLAINTIFF/PETITIONER

Name   David R. Taylor

Address

PLAINTIFF/PETITIONER

Name

Address

DEFENDANT/RESPONDENT

Name   Sparxent, Inc., a Delaware Corp.

Address

DEFENDANT/RESPONDENT

Name

Address

ATTY FOR PLAINTIFF/PETITIONER

Name Matthew M. Durham          Bar # 6214

Address Stoel Rives, LLP
201 South Main Street, #1100
Salt Lake City, UT 84111

ATTY FOR PLAINTIFF/PETITIONER

Name  Cameron L. Ward          Bar # 12271

Address Stoel Rives, LLP
201 South Main Street, #1100
Salt Lake City, UT 84111

ATTY FOR DEFENDANT/RESPONDENT

Name Kevin N. Anderson          Bar # _____

Address Fabian & Clendenin
215 South State Street, #1200
Salt Lake City, UT 84111

ATTY FOR DEFENDANT/RESPONDENT

Name

Address   *Original*          ___

## TOTAL CLAIM FOR DAMAGES (AMOUNT IN CONTROVERSY)

$_____

**JURY DEMAND**

■ Yes

## SCHEDULE OF FEES: §78A-2-301. CHECK ANY THAT APPLY.
(See case types on reverse for filing fees for complaints other than claims for damages.)

-------- **COMPLAINT FOR DAMAGES** --------

| | | |
|---|---|---|
| $75 | ❑ | Civil or Interpleader: $2000 or less |
| $185 | ❑ | Civil or Interpleader: $2001 - $9999 |
| $360 | ■ | Civil or Interpleader: $10,000 & over |
| $360 | ❑ | Civil Unspecified |

------------- **SMALL CLAIMS** -------------

| | | |
|---|---|---|
| $60 | ❑ | Small Claims: $2000 or less |
| $100 | ❑ | Small Claims: $2001-$7,499 |
| $185 | ❑ | Small Claims: $7,500-$10,000 |
| $50 | ❑ | Counterclaim: $2000 or less |
| $70 | ❑ | Counterclaim: $2001-$7,499 |
| $120 | ❑ | Counterclaim: $7,500-$10,000 |

------------- **MISCELLANEOUS** -------------

| | | |
|---|---|---|
| $250 | ■ | Jury Demand |
| $8 | ❑ | Vital Statistics §26-2-25 per form |

**Effective: May 12, 2009**

# COVER SHEET FOR CIVIL FILING ACTIONS Page 2 of 2
## Please Check Only One Category

| Fee | | Case Type |
|---|---|---|
| | | **---------------- APPEALS ----------------** |
| $360 | ❑ | Administrative Agency Review |
| $225 | ❑ | Civil (78A-2-301(1)(h)) |
| $225 | ❑ | Small Claims Trial de Novo |
| | | |
| | | **---------------- GENERAL CIVIL ----------------** |
| $360 | ❑ | Attorney Discipline |
| Sch | ❑ | Civil Rights |
| $ 0 | ❑ | Civil Stalking |
| $360 | ❑ | Condemnation/Eminent Domain |
| Sch | ❑ | Contract |
| Sch | ❑ | Debt Collection |
| Sch | ❑ | Eviction/Forcible Entry and Detainer |
| $135 | ❑ | Expungement (Fee is $0 under circumstances of §77-18-10(2)) |
| $360 | ❑ | Extraordinary Relief/Writs |
| $360 | ❑ | Forfeiture of Property |
| Sch | ❑ | Interpleader |
| Sch | ❑ | Lien/Mortgage Foreclosure |
| Sch | ❑ | Malpractice |
| Sch | ❑ | Miscellaneous Civil |
| Sch | ❑ | Personal Injury |
| $360 | ❑ | Post Conviction Relief: Capital |
| $360 | ❑ | Post Conviction Relief: Non-capital |
| Sch | ❑ | Property Damage |
| Sch | ❑ | Property/Quiet Title |
| Sch | ❑ | Sexual Harassment |
| Sch | ❑ | Tax |
| Sch | ❑ | Water Rights |
| Sch | ❑ | Wrongful Death |
| $360 | ❑ | Wrongful Lien |
| Sch | ❑ | Wrongful Termination |
| | | **----------- DOMESTIC -----------** |
| $0 | ❑ | Cohabitant Abuse |
| $310 | ❑ | Common Law Marriage |
| $310 | ❑ | Custody/Visitation/Support |
| $310 | ❑ | Divorce/Annulment |
| | ❑ | Check if child support, custody or parent-time will be part of decree |
| | ❑ | Check if Temporary Separation filed |
| $35 | ❑ | Foreign Domestic Decree |

| Fee | | Case Type |
|---|---|---|
| $360 | ❑ | Grandparent Visitation |
| $360 | ❑ | Paternity/Parentage |
| $100 | ❑ | Domestic Modification |
| $310 | ❑ | Separate Maintenance |
| $35 | ❑ | Temporary Separation |
| $35 | ❑ | Uniform Child Custody Jurisdiction & Enforcement Act (UCCJEA) |
| $35 | ❑ | Uniform Interstate Family Support Act (UIFSA) |
| | | **---------------- JUDGMENTS ----------------** |
| $35 | ❑ | Abstract of Foreign Judgment |
| $50 | ❑ | Abstract of Judgment or Order of Utah Court/Agency |
| $30 | ❑ | Abstract of Judgment/Order of Utah State Tax Commission |
| $35 | ❑ | Judgment by Confession |
| | | **---------------- PROBATE ----------------** |
| $360 | ❑ | Adoption/Foreign Adoption |
| $360 | ❑ | Conservatorship |
| $360 | ❑ | Estate Personal Rep - Formal |
| $360 | ❑ | Estate Personal Rep - Informal |
| $35 | ❑ | Foreign Probate/Child Custody Doc. |
| $360 | ❑ | Gestational Agreement |
| $360 | ❑ | Guardianship |
| $ 0 | ❑ | Involuntary Commitment |
| $360 | ❑ | Minor's Settlement |
| $360 | ❑ | Name Change |
| $360 | ❑ | Supervised Administration |
| $360 | ❑ | Trusts |
| $360 | ❑ | Unspecified Probate |
| | | **-------------- SPECIAL MATTERS --------------** |
| $35 | ❑ | Arbitration Award |
| $0 | ❑ | Determination Competency-Criminal |
| $0 | ❑ | Hospital Lien |
| $35 | ❑ | Judicial Approval of Document Not Part of Pending Case |
| $35 | ❑ | Notice of Deposition in Out-of-State Case/Foreign Subpoena |
| $35 | ❑ | Open Sealed Record |